UNITED STATES of America, Appellee,

v.

Larry Wayne HANKINS, Appellant.

No. 90–1046.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 14, 1990.

Decided April 26, 1991.

Susan Hunt, Kansas City, Mo., for appellant.

Michael Jones, Asst. U.S. Atty., Springfield, Mo., for appellee.

Before FAGG and BEAM, Circuit Judges, and ROY *, Senior District Judge.

BEAM, Circuit Judge.

Larry Wayne Hankins was convicted of armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d) (1988); use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and escape from federal custody, in violation of 18 U.S.C. § 751(a). He appeals from his convictions, claiming, *inter alia*, (1) that there was insufficient evidence to convict him of armed bank robbery and use of a firearm, (2) that the district court erred in admitting evidence of his escape, (3) that the district court erred in failing to give certain jury instructions, and (4) that the district court erred in assessing a two-level increase under the guidelines for obstruction of justice. After filing his brief on appeal, Hankins submitted a motion to this court for stay of the district court's restitution order. We affirm Hankins's convictions but remand to the district court for resentencing and consideration of the matter of restitution.

## I. BACKGROUND

On Monday, April 17, 1989, the Stone County National Bank in Cape Fair, Missouri, was robbed by two people shortly after closing time (3:00 p.m.). The bodies of the robbers were completely covered with clothing, including face masks and gloves. They gained entry to the bank by shooting the locked, glass front door with a shotgun. They left a spent, twelve-gauge shotgun shell on the floor with the shattered glass of the door. Once inside, the robbers instructed a lone bank teller to empty the contents of the cash drawer. From this drawer, the robbers received $2,007, including ten twenty-dollar "bait bills" (i.e., bills from which the serial numbers had been recorded beforehand). Both entering and leaving the bank, the robbers likely walked through the broken glass of the front door.

The bank teller saw the robbers drive away in a maroon and gray pickup truck with a distinctive bumper sticker on the tailgate. Another witness later reported seeing a pickup truck matching that description driving just outside of town at about 3:00 p.m. The truck was being driven somewhat erratically by a person wearing a dark-colored ski mask. The driver was alone. The pickup truck, which had been stolen, was later located in a shed just off Peebles Road, a short distance from where it was last sighted. Peebles Road leads to a group of homes in an area known as Peebles Point, which is about four miles from the Stone County National Bank.

* The HONORABLE ELSIJANE TRIMBLE ROY, Senior United States District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

Witnesses at Peebles Point told investigators that since the last week of March 1989 they had observed a man staying at a mobile home owned by Jewell and Robert Brownie, a sister and brother-in-law of Hankins. (The Brownies' trailer is less than one mile from the shed in which the stolen pickup truck was found.) The witnesses became suspicious of this man because of his schedule and activities. From a photographic lineup, they identified Billy Hankins, the appellant's brother, as the man staying at the trailer home. They also reported that the man had been visited the weekend prior to the robbery by a white male. Larry Hankins is a white male. One witness said that Larry Hankins "resembled" the other man at the trailer. The witnesses also reported seeing a late 1970s-model Chevrolet, with a maroon body and white top, parked at the Brownies' trailer. One witness noticed that the car had Oklahoma license plates. Larry Hankins drove a 1976 Chevrolet Malibu, with a maroon body and a white top—and he had Oklahoma license plates on the car. Hankins's next-door neighbor in Quapaw, Oklahoma, said she did not see Hankins or his car at home the day of the robbery or the weekend prior to the robbery. (She did see Hankins's wife and children, however, during this time period.) The next-door neighbor said she did see Hankins and his car on the morning of Tuesday, April 18, 1989—the day after the robbery.

Further investigation revealed that on April 19, 1989, the owner of the A–Able Bonding Company in Springfield, Missouri, received $150 cash from Hankins as payment for a bond debt. This payment contained two twenty-dollar bait bills taken during the bank robbery. In addition, on the same day, an attorney in Springfield, received a payment of $500 ($350 in cash and $150 by a check drawn from an account of Hankins's mother) from Hankins and his wife, Vickey. This payment also included two bait bills. Shortly after Hankins spent these bait bills, his Chevrolet Malibu was stopped by law enforcement officers and he was arrested. A later search of the car revealed a loaded, twelve-gauge shotgun shell in the trunk and—on the floorboard of the passenger's side—a paper bag containing ten loaded, twelve-gauge shotgun shells. Investigators also found pieces of glass on the carpet in the front seat area in the car. Some of these pieces of glass were found to have certain characteristics in common with the glass from the front door of the bank.

On the morning of April 27, 1989, seven days after being confined in the Greene County jail in Missouri, Hankins escaped from custody. He was found later the same day and returned to custody. In July 1989, a three-count indictment was returned by a federal grand jury, charging Hankins with the robbery, use of a firearm, and escape. Prior to trial, Hankins pleaded guilty to the escape charge. A jury trial began on September 5, 1989, for the remaining two charges and on September 8, 1989, Hankins was found guilty. Because of Hankins's escape from custody, the district court imposed a two-level increase under § 3C1.1 of the sentencing guidelines for obstruction of justice on the bank robbery charge.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Hankins argues that there was insufficient evidence to convict him of armed bank robbery and, therefore, that the district erred in denying his motion for judgment of acquittal. Hankins contends that the bait bills were the only evidence produced by the government to prove that he was present at the bank and participated in the robbery. We disagree. The bait bills were not the only evidence against Hankins and the total evidence—although not overwhelming—was sufficient to convict.

We apply familiar principles in our review for sufficiency of evidence. The evidence is considered in the light most favorable to the government and the government is entitled to all reasonable inferences that support the jury's verdict. *United States v. Marin–Cifuentes*, 866 F.2d 988, 992 (8th Cir.1989). Each element of the crime may be proven by circumstantial as well as direct evidence. *Id.* We do

not judge the credibility of witnesses. *United States v. Williams*, 897 F.2d 1430, 1432 (8th Cir.1990). And the evidence need not exclude every reasonable hypothesis except guilt; the evidence is sufficient if it will convince a trier of fact that the defendant is guilty beyond a reasonable doubt. *Marin–Cifuentes*, 866 F.2d at 992.

The most significant evidence against Hankins is that he was in possession of four of the ten twenty-dollar bait bills within forty-eight hours of the bank robbery. A reasonable inference from this possession of recently stolen money is that Hankins participated in the robbery. In *United States v. Nabors*, 762 F.2d 642 (8th Cir. 1985), we noted that

> the possession of property recently stolen, if not satisfactorily explained, "is ordinarily a circumstance from which a jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession not only knew it was stolen property, but also *participated in some way in the theft* of the property."

*Id.* at 653 (quoting *United States v. Johnson*, 563 F.2d 936, 940–41 (8th Cir.1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 746, 54 L.Ed.2d 768 (1978)). Hankins's only plausible explanation, in his testimony at trial, for how he received the bait bills, was that on Tuesday, the day after the robbery, a friend of his brother Billy met him at a roller skating rink and gave the bills to him as payment for a "dirt bike" purchased the year before. *See* Trial Transcript at 411–15. The jury evidently rejected Hankins's account.

In addition, when the evidence is viewed in the light most favorable to the government, there are other facts or circumstances that support the jury's verdict. *See United States v. Jones*, 418 F.2d 818, 827 (8th Cir.1969) (appellant's possession of bait bills stolen during an armed bank robbery the day before required corroborating evidence in order to convict the appellant of crime). Although there was some evidence that Hankins had legitimate sources of money during the month or so prior to his arrest, there was also some evidence of Hankins's impecuniosity in the months prior to the robbery and at the time of his arrest (i.e., financial affidavits Hankins signed after his arrest). Trial Transcript at 438–40. Thus Hankins's payments to the bond company and his attorney (totalling $500 in cash) two days after the bank robbery are probative of whether he participated in the crime. *See United States v. Pensinger*, 549 F.2d 1150, 1152 (8th Cir. 1977) (unexplained evidence of defendant's wealth, especially when there is a showing of impecuniosity prior to the crime, is relevant and admissible); *United States v. Morris*, 647 F.2d 568, 572 (5th Cir.1981) (same; evidence of impecuniosity not overwhelming). Hankins told the owner of the A–Able Bonding Company that he earned the money for his payment by trimming trees for the city of Quapaw, Oklahoma. Trial Transcript at 165. Testimony from an official for the city of Quapaw, however, revealed that Hankins had never worked for the city. *Id.* at 242.

The jury heard testimony regarding Hankins's escape from custody following his arrest. *Id.* at 255–80. As discussed below, a reasonable jury can infer consciousness of guilt and thus guilt itself from this evidence.

An automobile dealer testified that, to the best of his recollection, when he sold the Chevrolet Malibu to Hankins (twelve days prior to the robbery), "it was pretty clean." *Id.* at 24. A scientific analysis and comparison was performed with some of the pieces of glass found in Hankins's car and some of the shattered glass from the bank's front door. Because the pieces of glass found in the car were very small (about the size of the "dot of a period" "or smaller"), certain basic tests, such as a comparison of color and thickness, were not possible. *Id.* at 204–06. But some of the pieces of glass from the car were found to be consistent with the glass from the door of the bank in their refractive index and dispersion. *Id.* at 199.

Although none of the shotgun shells found in Hankins's car were identical to the spent shell left at the bank (e.g., the trade-

marks were not the same and the shot size was apparently different), they were all twelve-gauge shells.[1] *Id.* at 289–96. Hankins had just purchased his car fourteen days prior to his arrest, yet his brother Billy's marriage license was found in a suitcase in the trunk of the car. *Id.* at 188–89. Although Hankins testified that the suitcase belonged to his mother and that he had simply borrowed it without knowing that the marriage license was in it (*see id.* at 421–22), a jury could infer from this evidence that Hankins had recently had some contact with his brother. And, although no tangible evidence of Larry Hankins's presence was found in the Brownies' trailer, the fingerprints of his brother Billy—identified from a photograph as a man who was present at the trailer the weekend before the robbery— were found on some items in the trailer (e.g., a drinking glass found in the sink). *Id.* at 136–38, 148–49.[2]

Moreover, reasonable inferences supporting the verdict can be drawn from the testimony of certain eyewitnesses. As explained above, a next-door neighbor of Hankins testified that during the weekend preceding the robbery and on the day of the robbery, she did not see Hankins or his car at home. She did, however, see Hankins and his car at home on the day after the robbery *Id.* at 36–38. One witness at the Peebles Point area testified, after seeing a picture of Hankins's car, that he saw "one very similar to it," with an Oklahoma license plate, at the Brownies' trailer on Friday, April 14, 1989. *Id.* at 45–46, 49–50. Another witness at Peebles Point testified that she saw a similar maroon-colored car at the Brownies' trailer the weekend before the robbery; and—although she could not say "positively"—Hankins looked "familiar" or "resembled" one of two men she saw at the trailer that weekend. *Id.* at 54–55, 63. Although the bank teller testified that she did not remember the color of any clothing worn by the robbers nor could she discern the color of their clothing from a series of black-and-white photographs taken by the bank's surveillance camera, these photographs do show that one of the robbers wore pants of a lighter-color. *See id.* at 100; Government Exhibits 20A–L. The Peebles Point area witness who testified that Larry Hankins resembled one of the men she saw at the Brownies' trailer also testified that the man who resembled Hankins was wearing light-colored pants.[3] Trial Transcript at 74. This woman and yet another witness at Peebles Point were also able to identify Hankins's brother Billy from a photograph as one of the men present at the Brownies' trailer the weekend before the robbery. *Id.* at 30, 53. The bank teller testified that because the robbers were covered with clothing she could not see the color of their skin, but "[t]hey sounded like white males." *Id.* at 105.

1. Hankins mistakenly claims in his brief that "the gauge of the shotgun shells, recovered from the car, [was] different [than] the [gauge of the] shell found outside the bank." Brief for Appellant at 5. *See also id.* at 21 ("The shotgun shells recovered from [Hankins's] car did not match either the caliber or manufacturer of the shell recovered from the bank."). According to our review of the trial transcript and exhibits, however, this is not correct: the size of shot was apparently different, but the gauge was the same. Thus, the shotgun shells found in Hankins's car could be fired from the same shotgun used to fire the shell left at the bank. *See* Trial Transcript at 255.

2. In addition, the government states the following in its brief: "Also found in defendant's car trunk were two screwdrivers, one of which had a black and yellow handle. A screwdriver with a black and yellow handle was found to be holding shut the door of the old shed in which the stolen pickup used in the robbery was hidden." Brief for Appellee at 27–28. At oral argument, the government stated that the two screwdrivers were "similar." The government does not explain the significance of this evidence, but it is apparently suggesting that a reasonable inference can be drawn to support Hankins's conviction. There is no such inference, however, from our review. The screwdriver found at the shed and the screwdriver found in Hankins's car are from different manufacturers, of greatly different sizes, are of different shades of yellow, and are clearly not part of a matching set. In short, there is nothing "similar" about these items, with the exception that they are both screwdrivers.

3. An FBI agent who investigated the case testified that no clothing used by the robbers in the bank robbery was found in the course of the government's investigation. Trial Transcript at 286–89.

The bank teller also testified that she saw a maroon-colored car with an ivory-colored top—driven by a male and carrying two passengers (at least one of which was male)—"circle" the bank about ten or twenty minutes before the robbery. *Id.* at 89.

Altogether, the evidence is not overwhelming, but there is sufficient evidence from which a reasonable jury could convict Hankins.

## B. Evidence of Escape

■ Next, we consider Hankins's claim that the district court erred in allowing the admission of evidence relating to his escape from the Greene County jail. Hankins argues that evidentiary rules prohibit the admission of evidence concerning his escape and that the prejudicial effect of its admission was "accentuated" by the extensive testimony and by the lack of overwhelming evidence against him. We disagree and hold that the escape evidence was admissible.

It is widely acknowledged that evidence of flight or escape from custody is often " 'only marginally probative as to the ultimate issue of guilt or innocence.' " *United States v. Myers,* 550 F.2d 1036, 1049 (5th Cir.1977) (quoting *United States v. Robinson,* 475 F.2d 376, 384 (D.C.Cir.1973)). *See also Wong Sun v. United States,* 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 415 n. 10, 9 L.Ed.2d 441 (1962) ("we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime"). But it is also well established that such evidence is admissible and has probative value as circumstantial evidence of consciousness of guilt. An often-quoted statement from Wigmore's treatise on evidence states that " '[i]t is today universally conceded that the fact of an accused's flight, *escape from custody,* resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' " *Myers,* 550 F.2d at 1049

(quoting 2 J. Wigmore, *Evidence* § 276, at 111 (3d ed. 1940)) (emphasis added). It is for the jury to determine how much weight to give to such evidence. *United States v. Crosby,* 917 F.2d 362, 368 (8th Cir.1990).

Analytically, flight or escape from custody is generally considered an "admission by conduct." *Myers,* 550 F.2d at 1049. In *United States v. Peltier,* 585 F.2d 314 (8th Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979), we explained that the admissibility and probative value of flight evidence

> "depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."

*Id.* at 323 (quoting *Myers,* 550 F.2d at 1049). A court must carefully consider whether there are a sufficient number of evidentiary manifestations to support these inferences. *Id.* Most of the cases on this subject, like *Peltier,* involve evidence of *flight,* usually from the scene of a crime or from an arresting officer. The present case involves evidence of *escape,* but we see no distinction that would warrant an analytical approach different from that which is used in flight cases. Flight and escape are similar evasive acts. *See, e.g., United States v. Guerrero,* 756 F.2d 1342, 1347 (9th Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984) (evidence of escape met the *Myers* inference test); *United States v. Clark,* 506 F.2d 416, 418 (5th Cir.), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1957, 44 L.Ed.2d 454 (1975) (evidence of escape from custody analyzed as evidence of flight).[4]

The second and fourth inferences, it has been said, are often the most difficult to support, and that is true in this case as

---

**4.** One difference between flight and escape, however, might be in the degree of confidence with which certain inferences can be drawn from the evidence. For example, one could usually infer with complete confidence from behavior which constitutes an escape that the escapee was attempting to flee (i.e., the first *Myers* inference).

well. *See Myers,* 550 F.2d at 1049. But given the evidentiary manifestations in this case, the district court did not abuse its discretion in admitting evidence of Hankins's escape. One can confidently infer from Hankins's behavior that he was fleeing from custody. One can also confidently infer that Hankins's behavior was related to the armed bank robbery charges. Hankins gave a number of reasons for why he escaped (e.g., he thought he was being framed and he wanted to see his children) and these are all explanations for the jury to consider in weighing the significance of the escape evidence. But there is nothing in the record to suggest that Hankins escaped because he felt guilty about some other offense (i.e., the third inference above). Before his escape, Hankins had been made fully aware of the charges against him. Thus, "there is a sufficient basis in the evidence to warrant the inference that the flight 'was prompted by considerations related to the issue in question.' " *United States v. Roy,* 843 F.2d 305, 310 (8th Cir.) (quoting *Peltier,* 585 F.2d at 323), *cert. denied,* 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 916 (1988). *See also Crosby,* 917 F.2d at 368 (evidence of flight admissible when appellant knew of the charges against him and his scheduled trial date, yet disappeared on day of trial).

■ Hankins also argues that an unnecessarily extensive and prejudicial amount of evidence regarding his escape was received by the district court. Given the often marginally probative value of evidence of flight or escape and the risk of its prejudicial effect, district courts should be wary of the amount of evidence permitted on this subject and the way in which it is presented. *See, e.g., Peltier,* 585 F.2d at

324 (court determined that evidence was not presented in an "inflammatory manner" and, "in relation to the length of the trial, the time necessary for its presentation was brief"). The evidence of escape in Hankins's trial was not presented in an inflammatory manner, but it is our impression that more testimony than necessary was received by the district court.[5] We do not believe, however, that this constitutes an abuse of the district court's discretion.

Hankins's argument that *any* evidence of his escape was too much (or "especially prejudicial") because of the less than overwhelming case against him is without merit. Evidence against a defendant, which is otherwise relevant or admissible, should not be excluded simply because the total evidence is not overwhelming. In fact, the probative value of the evidence is made more significant by the less than overwhelming case and the government's " 'legitimate need for corroborative evidence.' " *United States v. Martinez,* 681 F.2d 1248, 1259 (10th Cir.1982) (quoting *United States v. Jackson,* 405 F.Supp. 938, 944 (E.D.N.Y. 1975)).

### C. Jury Instruction On Escape

■ Hankins also argues that the district court erred in not accepting his proposed jury instruction on evidence of escape.[6] There is no explanation in the record as to why the district court refused the proposed instruction, but after our review we disagree with Hankins that the district court erred. We have often noted that the district court "has 'wide discretion in determining the appropriate jury instructions,' and its choices of particular instructions may be reversed only for an abuse of

---

**5.** At trial, the government presented testimony from the prison guard who saw Hankins escape (including pictures showing the wall Hankins jumped over, the car on which he landed, etc.); testimony from the law enforcement officer who captured him later that same evening (including six photographs of the area where Hankins was hiding from authorities); testimony from an FBI agent regarding a conversation he had with Hankins, during which Hankins admitted planning the escape; and, finally, the government introduced a tape recording of a telephone call Hankins had with a friend after

his capture, during which he stated that he planned the escape. The cumulative effect of the government's evidence was objected to by Hankins's counsel at trial.

**6.** Hankins also argues that the district court erred in denying a proposed instruction that dealt with possession of recently stolen property. This was properly denied by the district court on the basis that it contained a misstatement of the law. *See United States v. Johnson,* 767 F.2d 1259, 1269 (8th Cir.1985).

discretion." *United States v. Wagner,* 884 F.2d 1090, 1096 (8th Cir.1989) (quoting *United States v. Shigemura,* 682 F.2d 699, 704–05 (8th Cir.1982), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983)), *cert. denied,* ── U.S. ──, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990). There was no abuse of discretion in this case.

The instruction Hankins had requested cautioned the jury on the extent to which it should infer guilt from flight. Hankins suggests in his brief that such an instruction is required by implication from the fact that in all or most of the cases in this circuit, in which the admissibility of evidence of flight was discussed on appeal, an instruction was provided by the district court. In addition, Hankins argues that in those cases this court considered the jury instruction to be an important precaution against evidence which is of marginally probative value.

■■■ The cases in this circuit, however, do not establish that an instruction on flight evidence is always required. In *United States v. White,* 488 F.2d 660 (8th Cir.1973), for example, we stated, "This circuit has recognized the propriety of introduction of evidence regarding flight and instructing the jury thereon. And it is generally recognized that such a procedure is proper *in appropriate cases.*" *Id.* at 662 (emphasis added). It is true that in some instances an instruction was considered by this court to be proper and helpful. *See, e.g., United States v. Schepp,* 746 F.2d 406, 410 (8th Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985) (noting approvingly that the district court cautioned "the jury against giving undue emphasis to the flight evidence"). But in other cases involving flight evidence, the defendants opposed the instruction and on appeal we simply found no error in the district court's decision to instruct the jury. *See, e.g., United States v. Blue Thunder,* 604 F.2d 550, 556 (8th Cir.), *cert. denied,* 444 U.S. 902, 100 S.Ct.

215, 62 L.Ed.2d 139 (1979) (finding "no error in the district court's decision to give a limiting jury instruction on flight"). The cases, therefore, establish no rule on this point and we believe that the decision whether to instruct the jury on flight is best left to the district court.[7] Given its marginally probative value and risk of prejudice, there may be many instances where the district court will determine that the evidence of flight or escape is best not mentioned in the instructions. The jury instruction manual developed by the district courts of this circuit is in general agreement. No model instruction on evidence of flight is provided and the committee comments state that such an instruction is "discouraged." *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit* 4.13 at 104 (1989 rev. ed.) (committee comments). *See also United States v. Robinson,* 475 F.2d 376, 384 (D.C.Cir.1973) (advises that "[t]he interest of justice is perhaps best served if this matter is reserved for counsel's argument, with little if any comment by the bench"); *see also* Federal Judicial Center, *Pattern Criminal Jury Instructions* 53 (1988) (noting in its commentary that in most cases an instruction on a defendant's incriminating actions after the crime should not be given—"[g]enerally, argument of counsel would sufficiently explain the issues"); Committee on Federal Criminal Jury Instructions of the Seventh Circuit, *Federal Criminal Jury Instructions* 3.05 (1980) ("[a]n instruction on [flight] gives undue weight to a particular piece of evidence which the Committee believes should be avoided").

### D. Obstruction of Justice

Hankins's questions whether his sentence "was imposed as a result of an incorrect application of the sentencing guidelines." 18 U.S.C. § 3742(e)(2) (1988). Our standard of review is *de novo.* *United States v. Werlinger,* 894 F.2d 1015, 1016

---

7. *United States v. McQuarry,* 726 F.2d 401 (8th Cir.1984) (per curiam), provides support. *McQuarry* held that the district court did not abuse its discretion in refusing to instruct the jury to consider evidence of the defendant's *failure to flee* from the site of the crime as evidence of his innocence. *Id.* at 402. And, in a concurrence, Judge McMillian stated that, in his opinion, "instructions on flight should be eliminated." *Id.* at 403.

(8th Cir.1990). The district court determined that Hankins's escape from custody constituted an obstruction of the administration of justice pursuant to § 3C1.1. On this basis, the district court enhanced Hankins's offense level total by two. Hankins argues that the district court's application of § 3C1.1 was an error. We disagree with Hankins's analysis, but find that the district court did err in calculating Hankins's sentence.

The probation officer calculated a guideline sentence range of 51–63 months in Hankins's presentence report (criminal history category IV; offense level total 20). This was calculated as follows. Pursuant to § 2B3.1(a) of the guidelines then in effect, Hankins received an adjusted offense level of 19 for the bank robbery (i.e., a base offense level of 18, plus an additional level, pursuant to § 2B3.1(b)(1), because the loss to a financial institution is treated as at least $5000). Pursuant to § 2P1.1(a), Hankins received a base offense level of 13 for the offense of escape. These two offenses, the bank robbery and the escape, were *not* grouped as closely-related counts pursuant to § 3D1.2.[8] According to the combined offense calculations of § 3D1.4, Hankins was assessed one unit for the bank robbery count and, because the escape offense was six offense levels less serious than the bank robbery, one-half unit for the escape count. This total of one and one-half units resulted in a one-level increase in Hankins's highest offense level (i.e., the bank robbery count), for a combined adjusted offense level of 20.

At sentencing, the district court simply added two levels to Hankins's combined adjusted offense level, to reach an offense level total of 22. The district court's rationale for this adjustment was that, pursuant to § 3C1.1 of the guidelines, Hankins's escape from custody constituted an obstruction of the administration of justice on the bank robbery count. Section 3C1.1 provides: "If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1 (effective November 1, 1989). After this adjustment, the district court determined that Hankins's guideline sentencing range was 63–78 months. The district court then sentenced Hankins to 78 months for the bank robbery; 60 months for the use of a firearm, to run consecutive to the bank robbery sentence; and 60 months for the escape (the statutory maximum), to run concurrent with the bank robbery sentence.

Hankins contends that the district court erred by adding two levels pursuant to § 3C1.1. According to Hankins, Application Note 4 of that section of the guidelines states an underlying principle which the district court should have followed.[9] Application Note 4 states:

Where the defendant is convicted for an offense covered by § 2J1.1 (Contempt), § 2J1.2 (Obstruction of Justice), § 2J1.3 (Perjury), § 2J1.8 (Bribery of Witness), or § 2J1.9 (Payment to Witness), this adjustment is not to be applied to the offense level for that offense except where a significant further obstruction occurred during the investigation or prosecution of the obstruction offense itself (*e.g.*, where the defendant threatened a witness during the course of the prosecution for the obstruction offense). Where the defendant is convicted both of the obstruction offense and the underlying offense, the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 (Groups of Closely–Related Counts). The offense level for that Group of Closely–Related Counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the

---

**8.** Hankins's conviction for use of a firearm was exempted from application of the multiple count rules. *See* U.S.S.G. § 3D1.1, Application Note 1 (effective November 1, 1989).

**9.** The parties emphasize a line of cases, illustrated by *United States v. Jimenez*, 897 F.2d 286 (7th Cir.1990) and *United States v. Bell*, 716 F.Supp. 1207 (D.Minn.1989), as part of their arguments on this issue. These cases are not analogous to the case at hand and therefore do not apply.

offense level for the obstruction offense, whichever is greater.

U.S.S.G. § 3C1.1, Application Note 4 (effective November 1, 1989).[10] Hankins contends that the offense of escape is analogous to the obstruction offenses listed by the Sentencing Commission in Application Note 4. Therefore, according to Hankins, a § 3C1.1 adjustment should not apply in his case. This analysis, however, is faulty: the application note does not list the offense of escape as an exception and the district court applied the enhancement to Hankins's *bank robbery offense*—not to the escape offense. Thus, the district court did not violate the express language or any underlying principle of the application note.

Hankins's conduct in escaping from custody surely warrants a § 3C1.1 enhancement to his bank robbery offense. The district court was correct in applying this guideline provision. Indeed, absent the complicating factor of Hankins's conviction for the offense of escape, the issue would likely not be appealed. The commentary of the guidelines now in effect lists escape as conduct to which the enhancement applies. *See* § 3C1.1, Application Note 3(e) ("escaping or attempting to escape from custody before trial or sentencing"). Application Note 4, however, describes the function of another guideline provision which should have been considered by the district court after deciding to adjust Hankins's offense level. Section 3D1.2 states in part,

> All counts involving substantially the same harm shall be grouped together into a single Group.... Counts involve

substantially the same harm within the meaning of this rule: ...

> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, *or other adjustment to*, the guideline applicable to another of the counts.

U.S.S.G. § 3D1.2(c) (emphasis added). The commentary to § 3D1.2(c) states that "[t]his provision prevents 'double counting' of offense behavior." U.S.S.G. § 3D1.2, Application Note 5. The commentary also expressly contemplates Chapter Three adjustments, such as the district court applied in this case, and it does not limit the application of this guideline provision to certain offenses. *See id.*

■ The probation officer did not group Hankins's bank robbery and escape counts, apparently because the bank robbery offense did not include an enhancement for the escape. However, when the district court adjusted Hankins's bank robbery offense level pursuant to § 3C1.1, the escape count then embodied conduct that was treated as an adjustment to the bank robbery count. After this adjustment, the district court should have grouped the bank robbery and escape counts according to § 3D1.2 and the other applicable multiple counts provisions found in Part D of the *Guidelines Manual*.[11] Grouping the bank robbery and escape offenses would produce a single Group of Closely–Related Counts and, once grouped, there is no incremental punishment for the offense of escape (of course, the bank robbery offense level has been enhanced by two levels for the obstruction of justice). According to our cal-

---

**10.** This application note was amended effective November 1, 1990, to include two additional offenses: § 2J1.5 (Failure to Appear by Material Witness); and § 2J1.6 (Failure to Appear by Defendant). *See* U.S.S.G. § 3C1.1, Application Note 6 (effective November 1, 1990).

**11.** The second paragraph of Application Note 5 in § 3D1.2 provides an example analogous to the present case:

> A cross-reference to another offense guideline does not constitute "a specific offense characteristic ... or other adjustment" within the meaning of subsection (c). For example, the guideline for bribery of a public official contains a cross-reference to the guideline for accessory after the fact for the offense that

the bribe was to facilitate. Nonetheless, if the defendant were convicted of one count of securities fraud and one count of bribing a public official to facilitate the fraud, the two counts would not be grouped together by virtue of the cross-reference. *If, however, the bribe was given for the purpose of hampering a criminal investigation into the offense, it would constitute obstruction and under § 3C1.1 would result in a 2–level enhancement to the offense level for the fraud. Under the latter circumstances, the counts would be grouped together.*

U.S.S.G. § 3D1.2, Application Note 5 (emphasis added).

culations, application of § 3D1.2(c) and § 3D1.3(a) produces a combined offense level of 21 for Hankins. *See* U.S.S.G. § 3D1.4, Application Note 1. Accordingly, we remand this case to the district court for resentencing consistent with this opinion.

### E. Motion Regarding Restitution

■ Hankins was ordered by the district court to pay restitution in the amount of $1,927.00 to the Stone County National Bank. According to Hankins, the penitentiary in which he is serving his sentence takes one-half of his income each month as a restitution payment. After he filed this appeal, Hankins filed a motion with the district court to establish a more lenient restitution schedule. According to Hankins, the district court informed him that because of his pending appeal it no longer had jurisdiction to consider the matter. Hankins then filed a motion with this court for stay of the district court's restitution order pending his appeal. Hankins argues that the present restitution arrangement "has caused problems for [him] as he has no money left for commissary or to send to his children." Because the district court is likely to be more familiar with Hankins's family needs and the terms and conditions of his punishment and restitution, we remand this issue to the district court for consideration.

### III. CONCLUSION

We have considered all other issues raised by Hankins and find them to be without merit. For the reasons stated, the convictions are affirmed. This case is remanded to the district court, however, for resentencing and consideration of the matter of restitution.