UNITED STATES of America

v.

James Roland CLARK.

Nos. LR–CR–91–40, LR–CR–91–41, LR–CR–91–42, LR–CR–91–193, LR–CR–91–194, LR–CR–91–195, LR–CR–91–197, LR–CR–91–198, LR–CR–91–199, LR–CR–91–217 and LR–CR–91–219.

United States District Court,
E.D. Arkansas, W.D.

April 24, 1992.

Jana Brown, Asst. U.S. Atty., for U.S.

Jack T. Lassiter, Jack Wagoner, III, Little Rock, Ark., for James Roland Clark.

## MEMORANDUM OPINION

EISELE, District Judge.

This written opinion supplements the findings and conclusions made by the Court from the bench in open Court during the sentencing of the defendant, Mr. James Roland Clark. It is, however, confined to only one of the issues dealt with during that sentencing process, to-wit: whether the Court, as suggested by the Government and the U.S. Probation Office, should increase the defendant's offense level by two under Guidelines Section 3C1.1, Commentary Application Note 3(e) for the reasons set forth in the following paragraphs of the Presentence Report:

44. After Mr. Clark entered pleas of guilty in the instant offense, he was again detained by federal authorities and housed in the White County Detention

Center in Searcy, Arkansas. The U.S. Marshal's Service received information indicating Mr. Clark and another inmate, Gary Thomas, were involved in a conspiracy to escape. This information was obtained from a third inmate who is now cooperating with the government in relation to this conduct and will not be named in this report. Documentation from the U.S. Marshal's Service states, "[an unnamed individual] stated Gary Thomas had confided in him and told him about the escape attempt. Thomas and Clark were working with a man on the outside who [the unnamed individual] believes is an elderly male that resides on 15th street in North Little Rock, Arkansas. Thomas was provided with files and with a 15 gauge, and 24 gauge hacksaw blade by a subject on the outside. The subject would come to the jail in the evening and pass them through the window to Thomas, and then return to take them back at the end of the evening. [The unnamed individual] stated that on January 4, 1992, at 8:45 a.m., Thomas made a phone call from the pay phone in the cell area to a subject on the outside arranging details in reference to the escape attempt."

45. Additionally, the information indicates a deputy of the U.S. Marshal's Service traveled to the White County Detention Center on January 6, 1992, for the purpose of investigating the alleged escape plan. The deputy marshal and local deputies searched the cell of Gary Thomas. The report of investigation from the U.S. Marshal's Service indicates, "[the deputy] observed that a window, above the bed in the cell housed by Thomas had been tampered with. The plexiglass had been removed and was being held in place by pieces of folded paper. The two bars behind the plexiglass had been removed and were being held in place by pieces of paper and strips of blankets. The metal screen behind the bars had been cut in several locations. A six (6) inch file was discovered by [a deputy] in the floor located in the shower and retrieved by [another deputy].

46. Based on the information outlined in paragraphs 44 and 45, Mr. Clark will receive an adjustment for obstruction of justice as he willfully attempted to obstruct or impede the administration of justice during the prosecution and/or sentencing of the instant offense. Commentary note number 3(e) under Section 3C1.1 specifically lists escaping or attempting to escape from custody before trial or sentencing as conduct to which an enhancement for obstruction of justice applies.

Guidelines Section 3C1.1 provides:

*Obstructing or Impeding the Administration of Justice*

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

Commentary 3e thereto provides:

3. The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies. . . .

(e) escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;"

At sentencing the following colloquy occurred between counsel and the Court concerning this issue:

THE COURT: Why don't, then, you state whatever objections that you have to the suggestion that the level be raised 2 for obstruction of justice on the basis of the facts I have just mentioned.

MR. WAGONER: Your Honor, do you want me to address just the obstruction or the obstruction and acceptance in one since they are all tied up?

THE COURT: Just the obstruction.

\* \* \* \* \* \*

MR. WAGONER: [Counsel for Mr. Clark] As far as the obstruction of justice, the legal objection to that, we object to that on due process grounds. Briefly, it's our position that this is in essence a crime. They can call it an enhancement and they can call it obstruction of justice

and say it's just a part of the sentencing procedure, but what it does is result in at least a possibility and perhaps a certainty—I would have to look at the numbers and the chart—that this defendant is going to be subject to additional time behind bars for something that he did that he has not been indicted for, has not had a chance to—

THE COURT: Let me go a little farther. It's not clear by reading these paragraphs if your client admits the facts as stated. I don't mean—first of all, does he admit that he was planning and attempting to escape.

MR. WAGONER: Absolutely not.

THE COURT: In other words, he denies that.

MR. WAGONER: He does deny that.

THE COURT: Let me ask the Government. Do you have any admissions or statements of the defendant's which you would rely upon to prove his guilt? . . . . Now, I don't gather he has admitted this to the probation office when they were interviewing him?

Would you please stand and state that for the record? I can't be sure because the way it reads—it goes on in Paragraph 46: "Based on the information outlined in Paragraphs 44 and 45, Mr. Clark will receive an adjustment for obstruction of justice as he willfully attempted to obstruct and impede the administration of justice during the prosecution and/or sentencing of the instant offense." That's not based upon anything he admitted or told the probation office, is it?

PROBATION OFFICER: No, sir, it's not.

THE COURT: In other words, it's based upon your investigation of the facts and the evidence the Government would put on if they were permitted to try to prove this.

PROBATION OFFICER: That's correct.

MR. WAGONER: Factually, Your Honor, it's our position that Mr. Clark never had any intent at any point of leaving that cell and that he asked to be transferred from that cell to another one before anybody in that facility knew that this escape attempt had been uncovered just because he did not want to be implicated in something of this nature.

THE COURT: Well, at this point we confront several serious issues, not the least of which is the one that you have mentioned. First of all, way back before the guidelines were put into effect in 1987 I wrote a monograph on the applications that we are dealing with here, including the attempt to use the obstruction of justice as a guideline with respect to an attempted escape. I contrasted how the guidelines would operate with the case that I just had a little bit earlier. You remember when the man flew the great quantities of marijuana in from South America? What was his name? Valverde. So we ended up giving him 50 years, which I gather was the maximum. Then while he was—I don't know whether it was before sentencing or after sentencing, but in any event there was the allegation that he attempted to escape and the prosecution, relying upon some 200 years of practice, decided that that was a crime. So they charged him with attempting to escape and he was either tried or pled guilty. In any event, he was found guilty of it, and I think we gave him another seven years.

But he had an indictment, he had the chance to plead guilty or not guilty, he had the chance to be tried before a jury, presumed to be innocent. It was viewed as a crime. And this particular one that we are dealing with here is not even—it's not related in any temporal or contextual way to the crimes for which he has pled guilty. It's post-conviction. It's a post-conviction crime. He's pled guilty, so it's just as if the jury had found him guilty. He's guilty, and now after that something else happens. And that's because, as I read it here—it could have happened before while he was awaiting a plea, but it says, "After Mr. Clark entered pleas of guilty in the instant offense"—and, by the way, what was the date of that?

MR. WAGONER: July 14th.

THE CLERK: November 18th.

THE COURT: November 18th in which he pled, and then these allegations turn around actually in January of 1992. I guess in the first instance I would have to acknowledge that the Government and the probation office are correct in pointing to the guideline section 3C1.1, which says: "If the defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice during the investigation, prosecution or sentencing of the instant offense, increase the level by 2 levels." And it goes go on by application note to specifically identify escaping or attempting to escape from custody before trial or sentencing or wilfully failing to appear as ordered by judicial proceeding.

And, of course, it's a new set of factual allegations. There's been no indictment. If we proceed to a hearing it will be on an informal basis that the Presentence Report sets forth what it is contending happened and he will have an opportunity essentially to deny it if the Government puts on proof consistent with the statements contained in Paragraphs 44, 45 and 46.

Once again—and, of course, we are awaiting the *Galloway* decision, but it seems to the Court that we are playing games with language if we simply say that what's charged here, the obstruction of justice, is nothing more than "a sentencing factor" or a "specific offense characteristic," or whatever other than what it appears to be to the Court, and that is a violation of the law, a crime, for which he could be indicted and for which he could be tried and which he might well be found guilty of. That option, as I see it, is still open to the Government, but I am going to sustain the defendant's contention based on, as I view it, the Constitution; that if the Government wishes to penalize him and send him to prison for this conduct they will have to indict him. It will proceed as any other criminal case from that point forward. So, on that particular basis I am going to essentially hold for the defendant. I am cutting off the Government's opportunity to prove. They are there with witnesses.

I assume they would have witnesses who would essentially testify to what we find in 44, 45, and 46. And I gather these are eye witnesses, correct? This isn't hearsay. This is the typical type of evidence you would use in a criminal trial.

MS. BROWN: Yes, Your Honor, it is.

THE COURT: In other words, frequently in these guidelines cases under the fact finding provisions under Part 6 of the guidelines the government comes in with hearsay and other kinds of reports. And, of course, that particular provision provides that the Court "may" use such "information" if it has substantial indicia of reliability; but here at least you are talking about criminal quality evidence that you would use in a criminal case if the case were actually tried.

MS. BROWN: Yes, Your Honor.

THE COURT: So, I am assuming that you could make the proof or at least you would offer it and then I would have to hear the defendant and make a factual determination whether he was guilty or not guilty of the crime charged. And if I found him guilty, under your version he would get the 2 point increase here.

So, whatever I'm saying here, though, I don't want to suggest that the Government is prevented from pursuing this matter. As I see it, they may, if they wish to, as a criminal matter. But I think it is not only a question of the quality of the evidence, there would be the question of whether under the Fifth and Sixth Amendments to the Constitution he is entitled to be taken before a grand jury, have an indictment returned. He has the opportunity to plead. He is presumed to be innocent. The Government has the burden of proving his guilt beyond a reasonable doubt. That also, I gather, the Government and the probation office would say, "No, a preponderance of the evidence would be enough." but I'm viewing it differently, and until we get the ruling at least in the *Galloway* case I am standing by my view that the Constitution protects people who are charged with crimes and particularly crimes for which they may suffer a pen-

alty in excess of six months, they must be indicted and they must have the opportunity for a jury trial and all of the other benefits that flow from our Constitution when the Government chooses to charge a person with a crime.

So, on that basis that particular matter is resolved.

To clarify the reference to the "monograph" in the above colloquy the Court notes that back in 1987, before the effective date of the new Guidelines system, it wrote a monograph on the anticipated effect of the new Guidelines system, emphasizing the due process and constitutional issues thought to be implicated. A hypothetical case involving a bank robbery was used. Not only were "specific offense characteristics" issues covered but also other "enhancements" including the one for "obstruction of justice." The hypothetical case assumed, *inter alia,* that after conviction, but before sentencing, the defendant had attempted or conspired to escape from custody. I quote therefrom:

"A second example will adequately complete the picture. It relates to the imposition under the proposed guidelines system of criminal penalties, including imprisonment, based upon post conviction conduct for which the defendant has never been charged or indicted. In order to contrast the practice contemplated under

the guidelines, let us look at the manner in which such issues are presently handled. The example comes from an actual case. A person was indicted for importing a large amount of marijuana into the country. He pled "not guilty", was tried before a jury, convicted, and later sentenced to fifty years in prison. While he was awaiting sentence (i.e. after his conviction), the government alleged he tried to bribe his jailers and that he attempted to escape. So he was indicted for those crimes, pled "not guilty", was tried before a jury, convicted, and later sentenced to an additional term of seven years. All very straightforward and traditional. But how will such matters be handled under the Guidelines System?

This type of issue is related to, but different from, the issues in *U.S. v. Galloway,* 943 F.2d 897 (8th Cir.1991). The opinion in that case was vacated on November 20, 1991, and the matter set for rehearing en banc. It is presently pending decision by the full Eighth Circuit Court of Appeals. It is similar because it raises the question whether certain conduct on the part of a defendant, brought forth for the purpose of increasing the penalty to be imposed upon the defendant, is a "crime" entitling the defendant to all of the protections of the Fifth and Sixth Amendments to the U.S. Constitution.[1] But the *Galloway* case

1. This trial court in *Galloway* held Guideline Section 1B1.3(a)(2), the "related conduct" guideline, unconstitutional as applied. There the defendant pled guilty to one count of theft from an interstate shipment involving goods valued at $37,000.00. However, the Presentence Report alleged the defendant had participated in seven additional such thefts over a long period of time involving goods valued at $1,009,950.00. If permitted these adjustments would have had the effect of tripling Galloway's sentence. The decision of the Court is set forth in the Eighth Circuit panel decision as follows:

Galloway objected. He contended that the alleged uncharged conduct could not be used to calculate his sentencing range under section 1B1.3(a)(2) of the Guidelines. The district court agreed, after making the following observation:

The Court notes that yesterday it sentenced Mr. Galloway's co-defendant, Mr. W.J. Young, to five months imprisonment with two years of supervised release. Mr. Young had pled guilty to Count I of a two count indictment

and the Government had moved the dismissal of Count II. The same situation that has occurred here . . .

I also note that the presentence reports in the two cases contain much identical language; indeed, the paragraphs that you talk about, 13 through 20 [detailing charged and uncharged conduct] are identical. . . .

Now if the facts contained in the presentence report are true, then it is clear that the Defendant Young and Defendant Galloway are really poles apart in terms of their culpability, at least to the degree of their involvement in criminal activity. But the Government has chosen to place identical charges against these two defendants. It charged Mr. Young with the only crime that he committed, at least as reflected by the presentence report—that is, the March 22, 1990 theft.

But the government has charged Mr. Galloway with only one of eight different crimes which it says he committed, and that was the least serious of the ones mentioned in the report. *And the only crime, of course, that*

dealt with admittedly similar crimes committed by the defendant *before* his federal conviction. Here we are dealing with post-conviction conduct that is not similar to, or related to, the many crimes (bank robberies) with which the Mr. Clark was charged and as to which he stands convicted upon his guilty pleas.

Defendant's offense level was calculated at 29 before considering the suggested enhancement. If enhanced, his offense level would go to 31. Defendant's Criminal History Category was fixed at IV. Therefore level 29 translates into a sentencing range of 121–151 months; level 31 into a sentencing range of 151–188. So if the Government were to prevail, Defendant would be exposed to possible additional imprisonment of over three years for a crime (attempted escape or conspiracy to escape) that he adamantly denies he committed. The government seeks to establish Mr. Clark's guilt through the use of the informal fact-finding procedures contemplated by Chapter 6, Part A of the Guidelines and thereby to avoid the necessity of indicting him for the crime of escape and affording him the protections of the U.S. Constitution.

In *Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970), the Supreme Court held that the defendant was entitled to a jury trial for "jostling" because, under the city ordinance, there was the possibility that the sentence could ex-

> *Mr. Galloway has pled guilty to is the one in Count I—that is, the one that Mr. Young pled guilty to—but I gather the government wishes the court to sentence Mr. Galloway as if it had charged him with the eight thefts exceeding $1 million in value and as if he had been convicted of all those charges.*
>
> Now this is a question. The government could have charged him with all the criminal conduct that they mention in the report and he could have pled guilty or not guilty, and if he had pled not guilty he could have been tried and, if convicted, we would not be dealing with these problems. It would be absolutely clear what the factual basis for the sentence should be. *But the government didn't choose to follow that path, and I gather it's because of the sentencing guideline laws. I don't think the Government views Mr. Galloway and Mr. Young as equal in culpability. I'm just getting the impression—I may be wrong—they are saying, "Why should we bother? Under the guidelines if he pleds [sic] guilty to one of these, then we will ask the Court to sentence him as if he had been convicted of all of them," and that they say, is what the guidelines call for. And they may be right but I am resisting to a certain extent that idea.*
>
> Sent. Tr. at 10–13 (emphasis added).

The district court went on to hold section 1B1.3(a)(2) unconstitutional as applied, reciting the following rationale:

> [I]f you look at Amendment V to the Constitution you see that, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury."
>
> Now it says a crime, and the Supreme Court has interpreted crimes to mean anything that might subject one to the possibility of imprisonment for more than six months. And it also says no person shall be held to answer. Well, is Mr. Galloway being held to answer for that conduct here if it's established his sentence will be increased five, six years? Yes, I think if that crime is proved [at the sentencing hearing], he will be held to answer here.
>
> Amendment VI says: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." In "all" criminal prosecutions. Are we engaged in a criminal prosecution here, or is it some sort of legerdemain? Are we converting this crime into a sentencing factor? It also says—that is, Amendment VI—that he has a right to be informed of the nature and cause of the accusation. Of course, that would have been done if Amendment V had been followed.
>
> I am going to conclude as a matter of law that in this case the Government may not, in the posture of this record, enhance the sentence of the defendant by proving by a preponderance of the evidence the conduct and acts referred to in paragraphs 13 through 19 because I feel it would violate the defendant's constitutional rights. What we have here is what I have referred to as the Russianizing of our Constitution. The language is quite clear, but we can, by sophistry or otherwise treat it and ignore it and that's what happened in other countries. I don't want to see it happen here.
>
> Sent. Tr. at 28–29. Accordingly, the court refused to permit the Government to prove the uncharged conduct.
> *Galloway,* 943 F.2d at 898–899.

The Circuit panel affirmed the district court without reaching the constitutional issues. It concluded:

> ... that the United States Sentencing Commission exceeded its statutory authority in promulgating the uncharged conduct provisions of section 1B1.3(a)(2) to encompass separate property crimes like Galloway's.
>
> *Id.* at 899. We await the Eighth Circuit's en banc decision.

ceed six months. Under the Guidelines we are not even talking about such non-specific sentencing *discretion;* we are looking at specific increases in "offense levels" based on non-charged conduct which translate directly into specific, non-discretionary, additional increments of imprisonment, creating thereby not only the possibility of additional imprisonment exceeding six months but, in most instances, a *requirement* of such additional incarceration, ranging up to life imprisonment.

The Fifth Amendment provides in part: *Amendment V:* No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury ...; nor shall any person ... be deprived of life, liberty or property without due process of law ...

The Sixth Amendment provides in part: *Amendment VI:* In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ... and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; Are we not here dealing with a "crime" and a "criminal prosecution"?

According to the Government, this Court could try the defendant on the escape charge without requiring the matter to be presented to a grand jury; without permitting the defendant to have a jury trial; without requiring proof beyond a reasonable doubt; without the defendant's having any right to confront his accusers; without meeting even civil trial evidentiary or procedural requirements; and upon finding his guilt by a preponderance of the evidence, could sentence him to an additional three years plus in prison.

Surely an attempted escape under the circumstances described in paragraph 44, 45 and 46 of the Presentence Report would constitute a federal crime. *See* 18 U.S.C. § 751(a).

Can we avoid the necessity of an indictment and a full criminal jury trial by simply calling the defendant's "escape" conduct a violation of an "obstruction of justice" guideline and then proceed to send him to prison for three additional years for that "non-criminal" conduct? Although this Court is inclined to answer, "Absurd? Impossible?", it has long since learned that there is not much under the Guidelines system that our appellate courts have identified as suspect under the constitution. Indeed, the Eighth Circuit Court of Appeals in *U.S. v. Hankins,* 931 F.2d 1256 (8th Cir.1991) discussed the problem without mentioning the Constitution. There the defendant was actually charged with, and convicted of the crime of escape along with the crimes of armed bank robbery, and the use of a firearm during a crime of violence. So the defendant had all of the protections the Constitution provides with respect to the escape charge. The problem in *Hankins* arose out of the following circumstances:

> At sentencing, the district court simply added two levels to Hankins' combined adjusted offense level, to reach an offense level total of 22. The district court's rationale for this adjustment was that, pursuant to § 3C1.1 of the guidelines, Hankins' escape from custody constituted an obstruction of the administration of justice on the bank robbery count.

*Hankins,* 931 F.2d at 1264.

While the Eighth Circuit panel disagreed with the defendant's contention that this enhancement should not have been made, it did give some relief because of the trial court's failure to "group" properly after making the enhancement. But the Court's language makes clear its opinion that the enhancement would be proper *under the Guidelines.* Note its language:

> "Hankins' conduct in escaping from custody surely warrants a § 3C1.1 enhancement to his bank robbery offense. The district court was correct in applying this guideline provision. Indeed, absent the complicating factor of Hankins' conviction for the offense of escape, the issue would likely not be appealed. The commentary of the guidelines now in effect lists escape as conduct to which the enhancement applies. *See* § 3C1.1, Application Note 3(e) ("escaping or attempting

to escape from custody before trial or sentencing").

*Id.* at 1265.[2]

So this Court accepts that Guideline Section 3C1.1 and Application Note 3(e) support the position of the Government and the probation officer here. The problem, however, is with the Constitution, not the interpretation of the statute or the Guidelines. As noted, the conduct of the defendant as described in paragraphs 44, 45 and 46 of the Presentence Report would, if proved, constitute a federal crime.

The problem that many courts have had in dealing with due process and other constitutional issues raised by the Guidelines derives, the Court suggests, from an inadequate understanding of the pre–1987 sentencing system. Such issues can be made clearer if we assume for the moment that there never was a different sentencing system. In other words, let us assume that, after the effective date of the Fifth and Sixth Amendments, Congress proposed this "Sentencing Guidelines" system. Can there be any doubt that, under that hypothesis, all of their fact-based "enhancements" would be struck down on the ground that they were "crimes" being charged in "criminal prosecutions"?

But our experience with the pre–1987 discretionary sentencing system tends to mislead us. Many assume that the new system must be constitutional if it can be said that the defendant is "better off" under the new system than under the old. Of course the defendant is not better off, as the Court will soon demonstrate. But even if he or she were better off, that would not mean that the penalty-enhancing, "fact-finding" provisions of the Guidelines are constitutional.

Let us follow through the argument more carefully. Under the old discretionary sentencing system, only the elements of the crime charged had to be proved in order to give the Court the power to sentence anywhere within the congressionally established statutory range, such as 0 to 20

years for, say, ordinary bank robbery. So the Court could put the convicted offender on probation or sentence him to 20 years, or anything in between, without the proof of any facts other than the elements of the crime charged in between.

Now, under the Guidelines, the offense level for robbery is 20 and this translates into a sentencing range of from 33 to 41 months. This means that the maximum sentence for the crime of robbery as charged in the indictment is now 41 months. So, whereas under the old system, upon a conviction for simple bank robbery, the Court could impose any sentence from probation to 20 years, now the Court can only impose a sentence from 33 to 41 months. It must be quickly pointed out that none of these constitutional problems would arise if everyone were content to accept 41 months as the maximum penalty that could be imposed in this situation. But, no, the Guidelines system now proposes to enhance or increase the penalty on the basis of some new and different factual allegation, i.e. different from the factual elements of the crime charged.

The defenders of the new system say "what's wrong with that. Under the old system the Court could increase the sentence all the way to 20 years for any reason or no reason at all. Now at least some proof of some new fact is required before the Court is permitted to go above the maximum sentence established by the Sentencing Commission for the crime actually charged." Exactly!

Under the old discretionary system the Congress placed its faith in independent judicial officers to pronounce just sentences upon the basis of all of the facts and circumstances relative to the crime and the criminal. (And Congress left the "relative to" decisions to those judges.) Upon proof of only the essential elements of the crime charged, this discretionary judicial sentencing power was fully released. There was, in that context, only a few ways that a Court could violate a defendant's constitu-

---

**2.** This Court has considerable difficulty with the *Hankins* Court even considering a Guidelines enhancement for escape in the context of a

separate conviction for that charge, but that problem does not affect this case.

tional rights when imposing sentence. For instance, if the trial judge stated in Court, "Mr. Smith, since you are a Baptist I am sentencing you to 15 years whereas if you were a Methodist the sentence would be five years." Of course, on appeal, that sentence would be thrown out and the judge properly castigated, or worse. However, if that same judge imposed the 15 year sentence for the same reason but said nothing on the record to reveal that unlawful reason, no appeal would have been successful.[3] Beyond such clearly unconstitutional reasons for a sentence, appearing of record, the trial Court had essentially unlimited discretion. That was the way Congress wanted it. There was, then, basically no limitation on the information the judge could rely upon in deciding upon a fair and just sentence.

The pre-guidelines case of *U.S. v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) supports this analysis by revealing how different the pre–1987 sentencing system was from the present guidelines system. At sentencing the trial judge there stated:

> I'm going to give my reasons for sentencing in this case with clarity, because one of the reasons may well be considered by a Court of Appeals to be impermissible; and although I could come into this Court Room and sentence this Defendant to a five-year prison term without any explanation at all, I think it is fair that I give the reasons so that if the Court of Appeals feels that one of the reasons which I am about to enunciate is an improper consideration for a trial judge, then the Court will be in a position to reverse this Court and send the case back for re-sentencing.
>
> In my view a prison sentence is indicated, and the sentence that the court is going to impose is to deter you, Mr. Grayson, and others who are similarly situated. Secondly, *it is my view that your defense was a complete fabrication without the slightest merit whatsoever. I feel it is proper for me to consider that*

*fact in the sentencing, and I will do so.* (Emphasis added.)

*Id.,* 98 S.Ct. at 2612. Grayson was sentenced to two years. It should be noted that, while the trial judge clearly indicated that he was considering, in imposing sentence, his belief that Grayson's defense, "was a complete fabrication," he at no time quantified any increase occasioned thereby. So we are left to guess as to the impact of its consideration of the defendant's perjury in the overall chemistry of discretionary sentencing. A divided panel of the Third Circuit directed that the defendant be resentenced "without consideration of any false testimony." As stated in the Supreme Court opinion:

> One judge, in a concurring opinion, suggested that the District Court's reliance on Grayson's false testimony in fixing the sentence "trenches upon a defendant's constitutional privilege to testify in his own behalf as well as his right to have criminal charges," such as one for perjury, formally adjudicated "pursuant to procedures required by due process." 550 F.2d 103, at 108.

*Id.,* 98 S.Ct. at 2612–2613.

Chief Justice Burger wrote the opinion for the *Grayson* majority. His analysis begins with a description of the philosophy behind the then in-place discretionary system:

> In *Williams v. New York* [337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) ], Mr. Justice Black observed that the "prevalent modern philosophy of penology [is] that the punishment should fit the offender and not merely the crime," and that, accordingly, sentences should be determined with an eye toward the "[r]eformation and rehabilitation of offenders."

*Id.,* 98 S.Ct. at 2613 (citations omitted). But this rehabilitation model had its own sentencing problems:

> Indeterminate sentencing under the rehabilitation model presented sentencing judges with a serious practical problem: how rationally to make the required predictions so as to avoid capricious and

---

**3.** One of the major faults of the old system was the absence of the requirement that the sentencing judge set out carefully and in detail the reasons for, and the rationale of, the sentence.

arbitrary sentences, which the newly conferred and broad discretion placed within the realm of possibility. An obvious, although only partial, solution was to provide the judge with as much information as reasonably practical concerning the defendant's "character and propensities[,] ... his present purposes and tendencies," *Pennsylvania ex rel. Sullivan v. Ashe* [58 S.Ct. 59, 82 L.Ed. 43 (1937)], and, indeed, "every aspect of [his] life." *Williams v. New York.* Thus, most jurisdictions provided trained probation officers to conduct presentence investigation of the defendant's life and, on that basis, prepare a presentence report for the sentencing judge.

\* \* \* \* \* \*

Of course, a sentencing judge is not limited to the often far-ranging material compiled in a presentence report. "[B]efore making [the sentencing] determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker* [92 S.Ct. 589, 30 L.Ed.2d 592 (1972)]. Congress recently reaffirmed this fundamental sentencing principle by enacting 18 U.S.C. § 3577 (1976 ed.):

> "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Thus, we have acknowledged that a sentencing authority may legitimately consider the evidence heard during trial, as well as the demeanor of the accused. *Chaffin v. Stynchcombe* [93 S.Ct. 1977, 36 L.Ed.2d 714 (1973)]. More to the point presented in this case, one serious study has concluded that the trial judge's "opportunity to observe the defendant, particularly if he chose to take the stand in his defense, can often provide useful insights into an appropriate disposition." *Id.,* 98 S.Ct. at 2614–2615 (footnotes and citations omitted). Against this background the court analyzed Grayson's argument that his sentence constituted punishment for perjury for which he was not indicted, tried, or convicted by due process. The Court's resolution of the issue makes apparent the dramatic differences between the old discretionary system with which it was dealing and the post-November, 1987 Guidelines system:

> In his due process argument, Grayson does not contend directly that the District Court had an impermissible purpose in considering his perjury and selecting the sentence. Rather, he argues that this Court, in order to preserve due process rights, not only must prohibit the impermissible sentencing practice of incarcerating for the purpose of saving the Government the burden of bringing a separate and subsequent perjury prosecution but also must prohibit the otherwise *permissible* practice of considering a defendant's untruthfulness for the purpose of illuminating his need for rehabilitation and society's need for protection. He presents two interrelated reasons. The effect of both permissible and impermissible sentencing practices may be the same: additional time in prison. Further, it is virtually impossible, he contends, to identify and establish the impermissible practice. We find these reasons insufficient justification for prohibiting what the Court and the Congress have declared appropriate judicial conduct.
>
> First, the evolutionary history of sentencing, set out in Part II, demonstrates that it is proper—indeed, even necessary for the rational exercise of discretion—to consider the defendant's whole person and personality, as manifested by his conduct at trial and his testimony under oath, for whatever light those may shed on the sentencing decision. The "parlous" effort to appraise "character," *United States v. Hendrix* [505 F.2d 1233 (2nd Cir.1974)], degenerates into a game of chance to the extent that a sentencing judge is deprived of relevant information concerning "every aspect of a defendant's life." *Williams v. New York.* The Government's interest, as well as the offender's, in avoiding irrationality is of

the highest order. That interest more than justifies the risk that Grayson asserts is present when a sentencing judge considers a defendant's untruthfulness under oath.

Second, in our view, *Williams* fully supports consideration of such conduct in sentencing. There the Court permitted the sentencing judge to consider the offender's history of prior antisocial conduct, including burglaries for which he had not been duly convicted. This it did despite the risk that the judge might use his knowledge of the offender's prior crimes for an improper purpose.

Third, the efficacy of Grayson's suggested "exclusionary rule" is open to serious doubt. No rule of law, even one garbed in constitutional terms, can prevent improper use of firsthand observations of perjury. The integrity of the judges and their fidelity to their oaths of office, necessarily provide the only, and in our view adequate, assurance against that.

*Id.*, 98 S.Ct. at 2617 (citations omitted).

Probably the most significant statement of Chief Justice Burger for our purposes will be found in his concluding remarks:

> *Nothing we say today requires a sentencing judge to enhance, in some wooden or reflex fashion, the sentences of all defendants whose testimony is deemed false.* Rather, we are reaffirming the authority of a sentencing judge to evaluate carefully a defendant's testimony on the stand, determine—with a consciousness of the frailty of human judgment—whether that testimony contained willful and material falsehoods, and, if so, assess in light of all the other knowledge gained about the defendant the meaning of that conduct with respect to his prospects for rehabilitation and restoration to a useful place in society.

*Id.*, 98 S.Ct. at 2618 (emphasis added).

Note that, as stated by Justice Burger, nothing in the old discretionary system *required* the sentencing judge to penalize a defendant who that judge believed to have testified falsely before that judge during the trial. That is simply not the situation under the Guidelines system. And this is a critical distinction. Here, upon a factual finding that Mr. Clark attempted to escape, his offense level would have *had to be* raised by two, which in turn, translates into a sentence which could be over three years greater than it would be without that two-level increase.

*Grayson* also reminds us how open-ended were the factors and circumstances which a Court could consider in sentencing a person under the old discretionary system. Indeed, as pointed out in the opinion, Congress reaffirmed that principle when it passed 18 U.S.C. § 3577, which was enacted as a part of section 1001 of the Organized Crime Control Act of 1970. The Sentencing Guidelines system is an entirely different animal representing a 180 degree turn-around in sentencing philosophy. The constitutionality of that completely new, sui generis, system must be tested and analyzed on its own terms.

In *Lewellen v. Sullivan*, 949 F.2d 1015 (8th Cir.1991), the Eighth Circuit panel majority held that a sentence may be enhanced two levels upon a finding of perjury (uncharged conduct) under Section 3C1.1 of the Guidelines, relying heavily upon *Grayson*. Judge Heaney did not dissent, but, in a concurring opinion, he stated his view that the issue should be reviewed by the entire Court en banc. It does not appear that the appellant in *Lewellen* raised the constitutional issues with which we are dealing here. However, Judge Heaney, apparently sua sponte, alluded to some of those issues and pointed out the essential irrelevance of *Grayson* to Guidelines sentencing:

> I recognize that many circuit courts have held that the obstruction enhancement may be applied to defendants who testify at trial. These courts, however, have relied on *United States v. Grayson*, a pre-guidelines case[ ] that has little relevance to guidelines sentencing. The *Grayson* Court held that consideration of a defendant's alleged false testimony at sentencing would be permissible to illuminate the defendant's need for *rehabilitation.* Because the guidelines reject rehabilitation as a sentencing factor, *see* 28

U.S.C. § 994(k) (1988), the rationale of *Grayson* simply does not apply under the guidelines. Instead, an obstruction enhancement under U.S.S.G. § 3C1.1 for false testimony punishes a person for perjury without indictment, trial by jury, or proof beyond a reasonable doubt. This is a practice *Grayson* rejected.

*Id.*, 949 F.2d at 1015 (citations omitted). The majority decision in *Lewellen* does not control this Court's decision because that decision did not take up and deal with the constitutional issues raised and decided here. This Court is firmly convinced that, *under the Guidelines*, perjury, even where it is committed at the trial and before the sentencing judge, must be considered a "crime" subject to the protections of the Fifth and Sixth Amendments because the determination that perjury has been committed *requires* a discrete, significant, *additional* penalty. As such it is conduct, without the proof of which, the defendant could *not* suffer such additional penalty. Why this is not apparent to all is beyond understanding.

Putting to one side its very limited contempt authority, what empowers a United States District court to send an inhabitant of this land to prison for specific periods of time in excess of one year? Is it not the conviction of a felony?

In Mr. Clark's case the Court could, upon his pleas of "guilty", i.e. his conviction for the many bank robberies with which he was charged, sentence him according to offense level 29. But what would entitle the court to sentence him to an *additional three years?* Answer: proof of the attempted escape, i.e. uncharged conduct. We know that the maximum sentences for the crimes charged (the bank robberies) will be 37 months less than the sentence that the Guidelines would permit if Mr. Clark is also found "guilty" of attempted escape. And that extra penalty may not be imposed under the Guidelines without proof of the attempted escape. That is, we are not dealing here with discretionary power. So, unless federal trial courts have the power to send people to jail without proof that they committed a "crime", this

Guidelines, fact-based enhancement system can not meet constitutional muster.

It is just smoke and mirrors to say that the additional three years is imposed as punishment for the bank robberies when, under the Guidelines, the defendant could not suffer such additional punishment simply upon proof of those robberies. No, the additional imprisonment can only be imposed upon satisfactory proof of the attempted escape, a crime that the defendant is alleged to have committed *after* his conviction upon the robbery counts.

The Court again mentions the *Baldwin* case, *supra,* which establishes a defendant's right to a jury trial in cases where the potential penalty exceeds six months. The rationale of that case conforms nicely to limits on the power of U.S. District Courts to imprison for contempt without a jury trial. Can it be said that the power of a district court under the Guidelines to send a person to prison for decades, even life, upon the basis of uncharged conduct, without the benefits of the Fifth and Sixth Amendments, is consistent with, or can be sensibly rationalized with, those well established rights?

This Court thinks not.

The changes made by the Guidelines system have been dramatic, and those changes were not inadvertent. The comments of the Commission in "Part A, Introduction" of the Guidelines published in 1987 are instructive. The Commission discuss "Real Offense v. Charge Offense Sentencing" and describes how the Commission moved back and forth on this issue. It then states that the present Guidelines have moved closer to a "charge offense" system, but goes on as follows:

> The system is not, however, pure; it has a number of real elements. For one thing, the hundreds of overlapping and duplicative statutory provisions that made up the federal criminal law have forced the Commission to write guidelines that are descriptive of generic conduct rather than tracking purely statutory language. For another, the guidelines, both through specific offense characteristics and adjustments, take account

of a number of important, commonly occurring real offense elements such as role in the offense, the presence of a gun, or the amount of money actually taken.

\*     \*     \*     \*     \*     \*

The Commission recognizes its system will not completely cure the problems of a real offense system. It may still be necessary, for example, for a court to determine some particular real facts that will make a difference to the sentence. Yet, the Commission believes that the instances of controversial facts will be far fewer; indeed, there will be few enough so that the court system will be able to devise fair procedures for their determination.

U.S.S.G., Ch. 1, Part A at 1.5–1.6 (1987). Note the language stating that under the Guidelines system, it may be necessary for the court "to determine some real facts that make a difference to the sentence." This Court submits that the term "real facts", which can and will result in imprisonment, is just a euphemism for what we are truly dealing with, to-wit: *crimes.* And when it is stated that "the court system will be able to devise fair procedures for" the determination of such "controversial facts", most judges, lawyers and even lay people are naturally shocked, because they know that "fair procedures", mandated or illuminated by the United States Constitution, the Federal Rules of Criminal Procedure and the laws of the United States, are already firmly in place to determine factual issues involving alleged criminal conduct.

To compare the old and the new sentencing systems it is necessary to recall the practice under the old regime.

Of course, judges under the old system, as noted above, took into consideration for sentencing purposes a myriad of facts and circumstances which were not charged in the indictment or information if those facts and circumstances were relevant to the sentence. Traditionally, the judge examined the prior criminal record of the accused; his or her level of education and intelligence; the family and employment record; the medical history and, particularly, the presence or absence of drug or alcohol problems; whether a weapon was used in the commission of a crime; the impact upon the victim or victims; and so on virtually without limit (because no two cases are exactly alike). But what happens if such facts or circumstances are placed in issue by the defendant's denial?

The Court believes that the usual practice under the old system was the one the Court followed. The defendant and his attorney were required to read the presentence report carefully. The first question asked at sentencing was: "Have you and your attorney carefully read and examined the presentence report?" After receiving an affirmative response the Court then asked, "Are there *any* factual errors or mistakes in the report, regardless of how trivial or insignificant they may appear?" At this point, each alleged error was noted and discussed. If a factor important to sentencing was, after discussion, still denied, *it simply was omitted from consideration.* The Sentencing Commission does not seem to acknowledge this as the typical, standard, practice under the old system. In its commentary to § A.3 it states that, "in current practice, factors relevant to sentencing are often determined in an informal fashion". Yes, "informal" up to the point that the defendant denies the truth of a certain fact. There is, of course, no reason for courts not to consider *admitted facts* or pertinent observations made during the trial which are relevant to sentencing even though not charged. But when a fact which might result in an increased penalty is denied, it is submitted that under the old practice judges ignored that fact and did not penalize the defendant therefor. Regardless, it is clear that under the old practice there was nothing that *required* a judge *to add a specific penalty on the basis of a finding of any particular uncharged fact.* This is not so under the Guidelines. The Guidelines system creates an entirely new ball game. The Commission acknowledges this when it states in its Commentary:

The informality is to some extent explained by the fact that particular offense and offender characteristics rarely have a highly specific or required sentencing consequence. This situation will no longer exist under sentencing guidelines. The court's resolution of disputed sentencing factors will usually have a measurable effect on the applicable punishment.

U.S.S.G. § 6A1.3 Commentary (1988).

Yes, indeed, "a measurable effect on the applicable punishment." In Mr. Clark's case, in excess of three years!

So we see that the situation is completely changed under the Guidelines. The old discretionary system has been replaced with a mandatory, fact-based system of penalty enhancements. Under the new system the statutory limits are usually of no importance. The sentence is determined by *mandatory* "guideline" regulations. Now facts, *in addition to the elements of the crime,* must be proved in order to "enhance" the penalty above that permitted by the Guidelines for the crime charged. And the proof of those facts *requires specific penalties.* Again, this is what is new. So we see that the new system deals not only with "sentencing"; it deals with the *establishment of criminal liability based upon the proof of uncharged facts.* Can anyone doubt that we are therefore dealing with "crimes" and "criminal prosecutions" within the meaning of the Fifth and Sixth Amendments?

Not so many years ago, Judge Marvin Frankel was complaining that the due process rights of defendants appeared to terminate at the moment of conviction by trial or guilty plea. This Court finds itself in agreement with many of his observations. Senator Kennedy has referred to Judge Frankel as "the father of Sentencing reform." See Supplementary Report of Sentencing Commission, dated June 18, 1987, page 3, footnote 15. But the question must be asked: what has that reform movement wrought? Whatever post-conviction due process problems existed before 1971–72, when Judge Frankel first spoke out publicly, they pale in insignificance in comparison with the due process problems that the Sentencing Guidelines create. Under the Guidelines, a guilty verdict or plea of guilty purports to give the authorities the green light to deal with the defendant as they might. Irony indeed.

The Court has found over 20 cases dealing with escapes and other conduct alleged to be "obstructions of justice" under Guidelines Section 3C1.1. Apparently, none of those cases involved a defendant who directly raised the constitutional issues discussed here.

Mr. Clark has challenged the constitutionality of Guidelines § 3C1.1 and Commentary Note 3(e). The Court concludes that those provisions, at least as they are sought to be applied in this case, are unconstitutional under the Fifth and Sixth Amendment, to the United States Constitution. Therefore, no two-level enhancement, as requested by the Government and the Probation Office, will be considered.