**UNITED STATES of America**

v.

**Enzo CATERINI, Defendant.**

**Crim. No. 90–350(SSB).**

United States District Court,
D. New Jersey.

Sept. 4, 1992.

---

Michael Chertoff, U.S. Atty. by Aidan O'Connor, Asst. U.S. Atty., Newark, N.J., for U.S.

Bennett M. Epstein, New York City, for defendant Caterini.

## OPINION

BROTMAN, District Judge.

This matter comes before the court to resolve disputed sentencing issues pursuant to Guidelines § 6A1.3 [1]. On June 8, 9,

---

1. Guidelines § 6A1.3, in relevant part, provides: *Resolution of Disputed Factors* (Policy Statement) (a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.

10 and July 15, 1992 the court held a hearing to resolve the following sentencing issues: (1) the amount of heroin to be attributed to defendant Caterini for guidelines purposes; (2) whether Caterini attempted to escape from Fairton Correctional Institute thereby mandating an upward departure for obstruction of justice; and (3) whether Caterini qualifies for a two point downward adjustment for acceptance of responsibility.

## I. BACKGROUND

On November 4, 1991 defendant Enzo Caterini pled guilty to a one count Superseding Information charging that between May 1990 and August 7, 1990, defendant did knowingly and intentionally conspire with Antonio DeMeo, Chaudry Mohammed Amin, Dante DeGrandis, Deborah Peth, and others, to distribute and possess with intent to distribute more than 100 grams of heroin, contrary to the provisions of Title 21, U.S.C. § 846.

The Pre–Sentence Report attributed Caterini with 1,024.19 grams of heroin giving Caterini an offense level of 32 pursuant to United States Sentencing Guidelines ("Guidelines") §§ 2D1.1(c) & 2D1.4. Caterini's plea agreement contained the stipulation that Caterini had, pursuant to Guidelines § 3C1.1, willfully obstructed justice and impeded the administration of justice in the instant offense by failing to appear before this court and fleeing to Canada prior to trial in violation of the stipulated terms of his pretrial supervision and release.

The plea agreement also contained a stipulation that Caterini has, pursuant to U.S.S.G. § 3E1.1, demonstrated recognition and acceptance of criminal responsibility for the offense charged. Accordingly, the

Probation department adjusted the offense level upward by two points for obstruction of justice pursuant to U.S.S.G. § 3C1.1 and downward two points for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. Caterini's total offense level was therefore 32. Because Caterini had a criminal history category of I and a total offense level of 32, the Pre–Sentence Report recommended an imprisonment range of 121 to 151 months under the guidelines.

Caterini has objected to the Pre–Sentence Report's recommendation that Caterini be attributed with 1,024.19 grams of heroin, giving defendant a base offense level of 32 [2]. The Government is in accord with the Report's recommendation as to the amount of heroin.

The Government asserts that because Caterini attempted to escape from Fairton Federal Correctional Institute ("Fairton F.C.I."), he should not receive the two-point reduction for acceptance of responsibility that the government had originally stipulated to in the plea agreement. Moreover, the government moves for an upward departure of two points pursuant to Guidelines § 5K2.0 as a result of the alleged attempted escape from Fairton.[3] Caterini contests that his sentence should be adjusted because of the alleged escape attempt. This court convened a hearing and heard extensive testimony to resolve these issues on June 8, 9, 10 and July 15, 1992. The Government produced witnesses and evidence in support of their position. The defendant put forward no witnesses but cross-examined the Government's witnesses. After considering the evidence presented and the submissions of the parties, the court makes the following findings of fact and conclusions of law.

**2.** § 2D1.1(c)(6) specifies that an offense involving at least one kilogram but less than three kilograms of heroin shall have a base offense level of 32.

**3.** The Government made application for the court to either upwardly adjust Caterini's sentence pursuant to § 3C1.1 or to depart upward by two points pursuant to § 5K2.0 by analogy to § 3C1.1. As Caterini is to receive a two point upward adjustment for obstruction of justice for

his flight to Canada and failure to appear before this court in violation of the terms of his supervised release pursuant to § 3C1.1, the court will treat the Government's application as one for departure. In any event, as the court finds that the Government has not met its burden of showing that Caterini attempted to escape from Fairton, the request would be denied under either § 3C1.1 or § 5K2.0.

## II. FINDINGS OF FACT

*Heroin*

1. On April 23, 1990, Sgt. David McCummings of the Newark Drug Enforcement Administration Task Force (DEA) acting in an undercover capacity as a potential buyer of heroin, met with defendant Caterini at the Airport Marriott Hotel ("the Marriott").

2. On June 8, 1990, Sgt. McCummings again met Caterini at the Marriott and obtained a sample of heroin from Caterini. The heroin had a net weight of .29 grams and was 67% pure. (Gov't Exh. G 1A).

3. On June 18, 1990, Caterini again met with Sgt. McCummings and purchased one ounce of heroin from Caterini for $6,500. The heroin had a net weight of 23.9 grams and was 57% pure. (Gov't Exh. G 2A).

4. On July 9, 1990, Caterini negotiated with Sgt. Dave McCummings over the price of an eighth of a kilogram of heroin. Caterini stated that he could supply a kilogram of heroin but he wanted to do the smaller amount and establish a relationship first. (Gov't Exh. G 103A—Tr. of telephone call by McCummings to Caterini).

5. On July 10, 1990, Sgt. McCummings telephoned Caterini and introduced another agent of the DEA task force acting in undercover capacity, Sgt. Guslavage, as his employer. Caterini told Sgt. Guslavage that he, along with "his people" have the capability of providing one to two kilograms of heroin a week and would produce that amount once a trusting relationship is developed. (Gov't Exh. G 105A, Tr. of telephone call between McCummings, Caterini and Guslavage at 3–4 & 6–11). Caterini said that the price for a kilogram of heroin would be $175,000 and that he wanted an additional amount of money, probably $5,000, for himself. (Gov't Exh. G 105A at 8).

6. Negotiations for the purchase of the kilogram continued and Caterini met Sgt. Guslavage at the Marriott on or about July 16, 1990, at which time Sgt. Guslavage "flashed" the $175,000 to be used to purchase the heroin to Caterini. After seeing the money, Caterini telephoned Dante De-Grandis at Guy's Restaurant in Brooklyn and talked with him in Italian. Sgt. Guslavage then spoke to DeGrandis and negotiated the deal for the kilogram. DeGrandis insisted that the transfer or deal for the kilogram occur in Brooklyn—the undercover agents were to come to DeGrandis' house and they would get half and then if the deal went smoothly they would get the other half; Sgt. Guslavage refused to go to Brooklyn for the kilogram. (Test. of Sgt. Guslavage on June 8, 9, 10 and July 15, 1992; Def.'s Exh. DC-2).

7. On the morning of July 17, 1992, Caterini spoke to Sgt. McCummings and set up a meeting to count the $175,000 and discussed a meeting between the agents and DeGrandis. (Gov't Exh. G 109A, Tr. of call between McCummings and Caterini on July 17, 1992).

8. On the afternoon of July 17, 1990, Caterini counted the $175,000 at the Marriott. (Gov't Exh. G 110A, Tr. of July 17, 1990 conversation at Marriott at 2–5). Caterini spoke to DeGrandis by telephone and told him that he had counted the money for the kilogram and arrangements were made for Sgt. Guslavage to meet DeGrandis. Negotiations continued about the specifics of the delivery of the kilogram and where the deal was to take place. (Gov't Exh. G 110A at 8–16). The agents asserted that they wanted DeGrandis to come to the Marriott with the heroin so they could examine it. (Gov't Exh. 110A at 9–10).

9. In the conversation of July 17, 1992, Caterini repeatedly assured the undercover agents that he and DeGrandis had the heroin and were capable of producing one to two kilograms of heroin. (Gov't Exh. G 110A at 14, 15 & 16).

10. Caterini, however, refused to have DeGrandis come to the Marriott or to have the deal go forward at the Marriott. (Gov't Exh. G 110A at 8–18). Caterini refused to bring the heroin to the Marriott because of concern about the possibility of being arrested for a large amount of heroin; in negotiating where to complete the deal for the kilogram he said:

> What is this? I mean, we gotta be the ones with stuff, don't worry. But the

money's fine, but nobody's, we're in a public place. I'm gonna go give me the money. Or you gonna do something, uh, strange. You know, it's not the ah, I'm not pick a; you don't wanna come to the house is fine.... But not even a hotel or night club. Or anything that has got rooms connected and this shit. Cause the stuff is the stuff. With the stuff you do time. Money you can get away with it ... The stuff, I don't give a fuck, ·is the stuff.

(Gov't Exh. G 110A at 11–12 & 8–15). Later in that same conversation Caterini reiterated his concern of the possibility of being arrested with the kilogram:

It's gonna be here, I told a certain time; near the bridge in New Jersey, you gonna be out. You pick the place, but not here. In this kinda thing; they got the product. They got the one that's going to jail for forty years. Fifty. Or maybe sixty. These days,....

(Gov't Exh. G 110A at 14 & 8–15). As Caterini refused to do the deal at the Marriott or bring the heroin there, Caterini and the agents agreed to find a mutually suitable place for the meeting with DeGrandis in New Jersey. (Gov't Exh. G 110A at 19–23 & 10).

11. Caterini, Dante DeGrandis, Antonio DeMeo and Sgt. Guslavage met on the evening of July 17, 1990 in the parking lot of Pinocchio's restaurant in New Jersey. Caterini, DeGrandis and DeMeo told Sgt. Guslavage that they had the kilogram of heroin but they refused to do the deal in New Jersey. DeGrandis assured Sgt. Guslavage that he would guarantee his safety and that the deal would go forward at his house in Brooklyn as planned. Sgt. Guslavage, however, refused to go to Brooklyn for safety reasons. (Test. of Sgt. Guslavage on June 8, 1992).

12. On July 30, 1990, Caterini told Sgt. Guslavage that he could produce a kilo of heroin and would sell it for the $175,000 as originally agreed after they first had done a smaller deal to establish trust. (Gov't Exh. 114A, Tr. of July 30, 1990 at 1–6).

13. On August 3, 1992, Caterini told Sgt. Guslavage that he no longer wanted to be given money on top of the price for the heroin because Anthony DeMeo and he were working together and they were going to supply heroin to Guslavage in the future. (Gov't Exh. G 116A, Tr. of call between Caterini, DeMeo and Guslavage on August 3, 1990 at 1–4; Gov't Exh. G 117A, Tr. of call between Caterini and Guslavage on August 3, 1990 at 1–2). Before Caterini and DeMeo exchanged the kilo, however, they wanted to establish trust with a transfer of "twenty-five" or 2½ ounces of heroin.[4] (Gov't Exh. G 116A at 5; Gov't Exh. G 117A at 2–4). DeMeo assured Guslavage that "he doesn't like to play games" and the deal will go smoothly from his side. (Gov't Exh. G 116A at 6).

14. On August 6, 1990, Caterini and DeMeo met with Sgt. Guslavage at the Marriott and negotiated the sale of the kilogram of heroin. Following this meeting, Guslavage followed the two to Caterini's apartment to continue negotiations. (Test. of Sgt. Guslavage of June 8, 9, 10 and July 15, 1992).

15. On August 7, 1990, Caterini told Sgt. Guslavage that he could get the heroin and he wanted Sgt. Guslavage to come to New York for the deal; the 2½ ounces would be in Caterini's apartment and the rest nearby his apartment, Sgt. Guslavage would get the heroin in "chunks" so that he would have the kilo in a short period of time (Caterini said that he would likely have the entire kilo by that night) (Gov't Exh. G 122B, Tr. of call between Guslavage and Caterini on August 7, 1992 at 1–4 & 6–7). Sgt. Guslavage refused to come to New York to do the deal. (Gov't Exh. G 122B at 2–4 & 6–8 and Gov't Exh. G 112C at 2). Caterini, however, wanted to do the deal in smaller portions in New York to protect himself. (Gov't Exh. 122B at 3, 7 & 8) ("And what if I come with you then, with

---

**4.** Caterini, for example, states: "You know, that's get a little trust, uh, between us." (Gov't Exh. G 116A at 5). That same day, he stated: "I just want to get moving for your sake too, be-

cause after you see a little trust you gonna get really served like the other one you want." (Gov't Exh. G 117A at 2).

the thing ... what's going to happen? Somebody is going to do something to me?").

In another telephone call on the evening of August 7, 1992, Guslavage called to tell Caterini and DeMeo that he would be leaving for Virginia soon and that they could deliver the 2½ ounces to his partner, Sgt. McCummings, at the Marriott. (Gov't Exh. 123 A at 1–2). DeMeo refused to come to New Jersey. (Gov't Exh. 123 A). Then, later that evening, Caterini called and reluctantly agreed to come to New Jersey with the 2½ ounces. (Gov't Exh. G 124 A).

16. On the evening of August 7, 1990, Caterini and DeMeo met with Sgt. Guslavage and Sgt. McCummings at the Marriott. Caterini and DeMeo informed the undercover agents that the kilogram would be delivered in 2½ ounce portions. Caterini showed the first 2½ ounce installment of heroin to Sgt. Guslavage in the men's room at the Marriott. Caterini and DeMeo were thereafter arrested on the evening of August 7, 1990. The heroin was supplied by Chaudry Mohammed Amin and had a net weight of 67.2 grams and was 36% pure. (See Test. of Sgt. Guslavage of June 9–10, 1992 & Gov't Exh. 3A).

17. Immediately after being arrested, DeMeo agreed to cooperate with the Government and called Chaudry Mohammed Amin on August 7, 1990 to arrange for the delivery of the next one or two installments of heroin. (Gov't Exh. G 125A, G 126A, & G 127A transcripts of telephone conversations between Amin and DeMeo). Amin agreed, in code to provide the next installment and met DeMeo on a street corner in Manhattan. (Gov't Exh. G 125A, G 126A & G 127A).

18. Caterini, DeGrandis, and DeMeo agreed and conspired to sell one kilogram of heroin to the undercover agents. Caterini, DeGrandis and DeMeo had the intent and ability to produce the negotiated kilogram of heroin. The court finds that the amount of heroin to be attributed to Caterini is 1,024.19 grams. This amount includes the .29 gram sample delivered on June 8, 1990, the 23.9 gram sample delivered on June 18, 1990 as well as the negotiated kilogram for a total of 1,024.19 grams.

*Flight to Canada and Acceptance of Responsibility* [5]

19. Caterini was arrested on August 7, 1990. He was released pursuant to a $150,000 personal recognizance bond. His release was subject to various conditions such as restricted travel, reporting as directed to U.S. Pretrial Services and twenty-four hour house arrest, except for employment, court appearances, medical reasons, and attorney conferences.

20. Caterini absconded from pretrial supervision and failed to appear at a scheduled hearing before this court resulting in an issuance of a warrant on February 14, 1991. Caterini was eventually arrested on May 17, 1991 by the Royal Canadian Mounted Police in Montreal, Canada. Caterini was indicted for bail jumping in violation of 18 U.S.C. § 3146 on June 6, 1991 (Crim. No. 91–246 (JFG)). Caterini waived extradition and was returned to the United States where he has remained in custody without bail.

21. Following an unsuccessful suppression hearing on the day of trial, November 4, 1991, Caterini pled guilty to a one count Superseding Information charging that between May 1990 and August 7, 1990, defendant did knowingly and intentionally conspire with Antonio DeMeo, Chaudry Mohammed Amin, Dante DeGrandis, Deborah Peth, and others, to distribute and possess with intent to distribute more than 100 grams of heroin, contrary to the provisions of 21 U.S.C. § 846.

22. The court finds that Caterini's conduct of fleeing to Canada and failure to appear at a scheduled hearing before this court in violation of the terms of his supervised release indicates that the Caterini has not clearly demonstrated a recognition and

---

**5.** Although not specifically presented at the hearing, for ease of reference the court includes the relevant facts relating to Caterini's flight to Canada in the findings of fact. The findings were derived from the court's file and are consistent with the uncontested facts contained in the Pre–Sentence Report.

affirmative acceptance of responsibility for his criminal conduct.

*Alleged escape attempt from Fairton*

23. After Caterini fled to Canada and failed to appear at a scheduled hearing before this court in violation of the terms of his release, Caterini was brought back to this District by the United States Marshals and incarcerated at the Fairton FCI.

24. On or about June, 1991, Reginald Barrett, a federal prisoner not connected to the underlying heroin conspiracy involved herein, was transferred to Fairton FCI and was housed in the same unit as Caterini.

25. Reginald Barrett testified before this court on June 9 and July 15, 1992 with regard to an alleged escape attempt from Fairton FCI. Having viewed the witness' demeanor in the context of his numerous convictions and his readiness to act as an informant, the court questions Reginald Barrett's credibility.

26. A short time after Barrett arrived at Fairton, Caterini spoke to Barrett and asked him general questions about Ultralight airplanes and if they could land and take-off in the recreation yard of the prison. Barrett told Caterini that it was unlikely that an Ultralight could successfully land and take-off in the recreation yard. (Test. of Barrett on June 9 and July 15, 1990).

27. On or about September, 1991, Barrett contacted the Marshal's Office and informed them of Caterini's questions. At the direction of the Marshal's Office, Barrett then attempted to obtain additional information from Caterini and kept the Marshal's Office informed of Caterini's actions.

28. As Barrett did not believe that an Ultralight could successfully land and take-off, Barrett suggested the alternative of a helicopter. Barrett stated that for a certain amount of money, he could arrange for a helicopter to land in the recreation yard and pick up prisoners. Barrett also told Caterini that he had a plane in Mexico that could be fixed and brought north.

29. Caterini drew a map of the recreation yard and spoke to a number of prisoners, including a person named Kosco, Robert Katz, Billy Parrish, and Jerry Winters, telling them that for a certain amount of money, Barrett could arrange for a helicopter. (Test. of Barrett on June 9 and July 15, 1992 & Gov't Exh. SEG 1).

30. In addition to speaking to the prisoners about the helicopter, Barrett arranged a "fly-by" of a helicopter with the Marshal's Office for a specific date and time; Caterini, however, did not see the fly-by as he was in segregation in or about October, 1991 due to threats made against the undercover agents to keep them from testifying at Caterini's trial. Although Barrett and Caterini told the prisoners that money would be required to get the helicopter, no money for the helicopter was ever produced. (Test. of Barrett on June 9 and July 15, 1992).

31. Information of the alleged escape attempt reached prison authorities and those prisoners who discussed the possible escape were put into segregation. The Bureau of Prisons, after conducting an investigation, did not bring any charges against Caterini relating to the alleged escape attempt.

32. The court finds that Caterini's actions did not amount to an attempt to escape from Fairton FCI.

### III. CONCLUSIONS OF LAW

#### A. *Applicable Standards.*

In *United States v. Kikumura*, 918 F.2d 1084, 1098–101, (3d Cir.1990), the Third Circuit emphasized that the procedural protection for a defendant in a sentencing hearing are significantly lower than the trial itself. *Id.* at 1099. Most pertinent sentencing facts need be proven only by a preponderance of the evidence and hearsay may normally be considered subject only to the "modest due process requirement that it bear 'some minimal indicia of reliability beyond mere allegation.'" *Id.* at 1100 & 1102; *see also United States v. McGlory*, 968 F.2d 309, 347 (3d Cir.1992) (where there is not a dramatic departure from the Guidelines, reliable hearsay is generally admissible and facts must be shown by a prepon-

derance of the evidence).[6] A sentencing court "considering an adjustment in offense level need only base its determination on the preponderance of the evidence with which it is presented." *United States v. Belletiere*, 971 F.2d 961, 965 (1992) (quoting *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir.1989)). The burden of persuasion rests on the party attempting to adjust the sentence. *McDowell*, 888 F.2d at 291.

## B. *Amount of Heroin*

The Guidelines provide, in offenses involving drugs such as heroin, that the defendant's offense level is to be calculated with reference to the amount of drugs involved in the underlying offense. *See* Guidelines §§ 2D1.1(a)(3) and (c); *see also United States v. Jacobo*, 934 F.2d 411, 416 (2d Cir.1991). If the narcotics transaction is not completed, the offense level calculation should normally include the weight under negotiation, unless the court finds that the defendant lacked the intent and ability to produce the negotiated amount. U.S.S.G. § 2D1.4, Application Note 1; *Jacobo*, 934 F.2d at 416. Specifically, Application Note 1 provides:

> If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the *weight under negotiation* in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did *not intend to produce and was not reasonably capable of producing.*

U.S.S.G. § 2D4.1, Application Note 1 (emphasis added). The Government has the

burden of proving by a preponderance of the evidence that the defendant intended to produce and was reasonably capable of producing the negotiated quantity of drugs under Guideline § 2D1.4. *See United States v. Reyes*, 930 F.2d 310, 315 (3d Cir. 1991); *see also United States v. Ruiz*, 932 F.2d 1174, 1184 (7th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991).

▮ Caterini objects to the recommendation in the Pre–Sentencing Report that his offense level should be calculated using the amount of 1,024.19 grams of heroin. Caterini argues that the kilogram amount was not "under negotiation" and that he had neither the intent nor the capability to produce the kilogram. For the reasons set forth below, the court rejects these arguments and finds that the offense level should include the kilogram of heroin so that the total amount is 1,024.19 grams of heroin.

### 1. "Amount under negotiation"

▮ Defendant first argues that he cannot be held accountable for the kilogram amounts as the kilogram amount was not "under negotiation" as required by Guideline § 2D1.4. In support of this argument, defendant cites both *United States v. Foley*, 906 F.2d 1261 (8th Cir.1990) and *United States v. Ruiz*, 932 F.2d 1174 (7th Cir. 1991). Both *Foley* and *Ruiz*, however, support a finding that the kilogram amounts were "under negotiation."

In *Foley*, the court held that the defendant's answering a *single* inquiry by the undercover agent as to the price for two ounces of cocaine did not support the finding that negotiation for the additional two ounces had taken place. The court reasoned that simply quoting a price is not sufficient to establish that the "amount

**6.** Where, however, the magnitude of the contemplated departure is sufficiently great that it can be fairly characterized as a "tail which wags the dog of the substantive offense," the procedural protection must be increased and the fact finding underlying the departure must be established at least by clear and convincing evidence and hearsay statements cannot be considered unless other evidence indicates that they are reasonably trustworthy. *Kikumura*, 918 F.2d at 1103. The court noted that while the traditional standards are likely to apply to as much as a ten-level increase, where the findings would increase the sentence from about 30 months to about 30 years—the equivalent of a 22–level increase, the heightened standards must apply. *Id.* at 1100.

was under negotiation" as there was no agreement to another sale of cocaine [7] and the other deals between the agent and the defendant were arranged with greater specificity. *Foley*, 906 F.2d at 1264–65.

Similarly in *Ruiz*, the court held that a single statement by the defendant Ruiz, "I'll get you the other kilo. And if you want, even ten more I can get," was not sufficient to establish "negotiation" for ten kilograms. *Ruiz*, 932 F.2d at 1183–84 & 1177.[8] The court reasoned that the "single comment" could not amount to a negotiation as it was not accompanied by any discussions as to any specifics or "details of the drug sale (e.g., price, quantity and location)" but stood alone as evidence of the alleged negotiation:

> Standing alone, as it does here, an offhand statement referring to larger quantities of narcotics that amounts to no more than braggadocio is insufficient to establish that those quantities were "under negotiation" as envisioned in the Guidelines § 2D1.4(a).

*Id.* at 1184.

Unlike the single offhand comments in both *Foley* and *Ruiz*, in the instant case, the kilogram deal was the subject of numerous discussions of the specific details of price, manner and location of delivery between Caterini and the undercover agents. On July 10, 1990, for example, Caterini told Sgt. Guslavage that he and "his people" had the capability of providing one to two kilograms a week once a trusting relationship was established. (Government Exh. G–105A at 3–4 & 6–11). Caterini further stated that the price for the kilogram would be $175,000 and that he would like an additional amount of money on top of that price, probably $5,000 for himself. (Gov't Exh. G–105A at 3–4 & 6–11).

On July 16, 1990 the agents agreed to a price of $175,000 and that amount was "flashed" to Caterini by the undercover agents; Caterini then called his co-conspirator Dante DeGrandis who spoke to the Sgt. Guslavage to try to come to agreement on the specifics of the transaction. DeGrandis then suggested the location and manner of the transaction: the deal was to take place in DeGrandis' house and the agents were to get half of the kilogram, and if that went smoothly, the rest was to be delivered later that evening. (Test. of Sgt. Guslavage, June 8 and July 15, 1992). Sgt. Guslavage, however, refused to go to Brooklyn for the kilogram. (Test. of Sgt. Guslavage, June 8 and July 15, 1992).

On July 17, 1990, Caterini counted the $175,000 and negotiations continued as to the specifics of the deal. The agents suggested that DeGrandis come to the Marriott in New Jersey and that the deal go forward there; Caterini and DeGrandis were concerned that they might be arrested for the full kilogram and refused to go to the Marriott. (Gov't Exh. G 110A at 11–12 & 8–16). Negotiations continued that day and defendants Caterini, DeGrandis, and DeMeo met in a mutually suitable place in New Jersey; at that meeting, Caterini, DeGrandis and DeMeo assured Sgt. Guslavage that they could produce the heroin but they asserted that the deal must go forward in Brooklyn. (Test. of Sgt. Guslavage, June 8, 1992). Because Sgt. Guslavage refused to go to Brooklyn for the deal the transaction did not occur on the 17th as planned.

After Sgt. Guslavage refused to go to Brooklyn for the deal, Caterini stated that they would still supply the kilogram for $175,000 but the kilogram would be delivered in smaller portions. (Gov't Exh. G 114A at 1–6; G 116A at 1–4; G 117A at 2–

---

**7.** The court stated: "Thus, had the two *agreed* to another sale of cocaine, any amount under negotiation for such a sale could be used in calculating the [base offense level]. But these facts show nothing approaching an agreement or negotiating. The only statement from Foley is that two ounces would go for the same price as two one ounce buys." *Foley*, 906 F.2d at 1265.

**8.** The lower court had erroneously included the ten kilogram amount in sentencing Ruiz although the previous discussions contemplated only a two kilogram deal. The offhand remark was made to a dealer who was unknowingly working with undercover agents. Ruiz made the remark after the dealer indicated that he was upset because Ruiz had produced only a single kilogram initially instead of the full two kilograms.

4; G 122B at 1–4 & 6–7). Caterini stated that Guslavage would first get 2½ ounces and then, if that went smoothly, he would then get the rest of the kilogram in 2½ ounce portions within a short period of time. (Gov't Exh. G 122B at 1–7 and test. of Sgt. Guslavage of June 8, 9, 10 and July 15, 1992).

Caterini insisted that the deal go forward in Brooklyn at his apartment on August 7, 1990 while the agents insisted that the deal go forward in New Jersey at the Marriott. (Gov't Exh. G 122B at 1–4 & 6–9, Gov't Exh. G 123A at 1–2). After Sgt. Guslavage told Caterini that he was leaving for Virginia and that he wanted Caterini to deliver the first 2½ ounces of heroin to his partner Sgt. McCummings at the Marriott, Caterini reluctantly agreed to bring the first 2½ ounces to the Marriott in New Jersey on August 7, 1990. (Gov't Exh. G 123A at 1–2, G 124A). At the Marriott, Caterini and DeMeo gave the agents the 2½ ounces and assured Sgt. Guslavage that they would deliver the kilogram in 2½ ounce portions. (Gov't Exh. G 123A, G 124A and testimony of Sgt. Guslavage).

The court simply cannot accept defendant's arguments that Caterini's statements to the agents were mere "braggadocio" not amounting to "negotiation" as was the single, offhand statement in *Ruiz*, "even ten more I can get" and the single assertion in *Foley* that the price for two ounces of cocaine would be a certain amount. As outlined above, Caterini's statements were not mere "idle boasts" but rather the very specific negotiation of an agreement to supply a kilogram of heroin including price, manner and location of delivery.

### 2. Intent and Capability

Defendant Caterini further argues that he did not intend to produce and was not reasonably capable of producing the kilogram amount. This court cannot accept defendant Caterini's arguments that he neither had the intent nor the capability of producing the kilogram.

In support of this argument defendant again cites *Ruiz* for the proposition that Caterini had a tendency to boast and that

his statements cannot be used to be used to determine whether he had the intent and the capability of producing the kilogram. As discussed above, unlike *Ruiz*, Caterini did not merely state "even ten more I can get" on one occasion. Caterini asserted on numerous times both his intent and his capability to produce the full kilogram over a long series of recorded conversations and meetings. (See Test. of Sgt. Guslavage June 8, 9, 10 and July 15, 1992; Def.'s Exh. DC2; Gov't Exh. G 110A at 14–16; G 114A at 1–6; G 122B at 1–4 & 6–7). Caterini thereby demonstrated both his intent and capability to produce the kilogram. *See United States v. Vazzano*, 906 F.2d 879, 881 & 884 (2d Cir.1990) (rejected defendant's argument that he was not reasonably capable of producing the negotiated amount as his statements that he was capable of producing large quantities of cocaine were unreliable "boasts"); *see also United States v. Hughes*, 970 F.2d 227, 230–31 (7th Cir.1992) (affirmed lower court's finding that defendants had the intent and capability to produce kilogram reasoning that case was distinguishable from *Ruiz* as there were recurrent conversations as to price and quantity whereby defendants spoke as if they were capable of providing the negotiated amount); *United States v. Cea*, 963 F.2d 1027, 1031 (7th Cir.1992) (defendant's intent to produce amount demonstrated by series of specific negotiations as to price and amount).

Caterini also demonstrated the firmness of his intent to produce the kilogram as he was willing to use his apartment for the kilogram transaction and was willing to give up his commission on the kilogram deal in contemplation of future deals. Caterini, "in other words, was not shooting the breeze with agents or randomly proposing hypothetical future transactions; he was dead serious about … distributing" the kilogram. *See Cea*, 963 F.2d at 1031 (court found intent and seriousness because defendant proposed further transactions and was willing to have transaction be carried out at his home).

This court's finding that Caterini's numerous assertions that he and his cocon-

spirators had the intent and capability to produce the kilogram did not result from Caterini's alleged tendency to engage in "braggadocio" is further supported by the assertions of Caterini's coconspirators that they, along with Caterini, had the intent and capability to produce the full kilogram.[9] (See Test. of Sgt. Guslavage June 8, 9, 10 and July 15, 1992; Def.'s Exh. DC2). Not only did Caterini's co-conspirators assert their intention to produce a kilogram but Caterini's co-conspirators also pled guilty to Informations charging them with crimes involving a full kilogram of heroin that arose out of the deal. One of Caterini's co-conspirators, Deborah Peth, who was Caterini's girlfriend and took calls from the agents for Caterini pled guilty on May 24, 1991 to a one-count Superseding Information charging her with knowingly and intentionally using a telephone to facilitate a conspiracy to distribute at least one kilogram of heroin. On September 4, 1990, DeMeo pled guilty to a one count Information charging him with conspiring to distribute one kilogram of heroin.

Nor does Caterini's failure to deliver the full kilogram prior to his arrest and the establishment of a piecemeal deal structure militate against a finding of capability. Section 2D1.4 specifically contemplates sentencing based on the total amount under negotiation although that total amount is not delivered. Moreover, a defendant need not produce the full amount in a single transaction to be held accountable for the full amount under negotiation. *See United States v. Macias,* 930 F.2d 567, 568–71 (7th Cir.1991). In *Macias,* for example, the court upheld the defendant's sentence based on the full negotiated amount of eight kilograms although the defendant had only produced five kilograms prior to arrest but had asserted that he could deliv-

er the remaining three kilograms within a short period of time. *Id.*

The court finds that the more likely reason that full kilogram was not transferred and the piecemeal deal structure was established was not because Caterini was incapable of producing the heroin but rather because Caterini was concerned that buyers were in fact undercover agents or that he would be apprehended with a large amount of heroin. *See Cea,* 963 F.2d at 1031 (court found that reason that transaction for the kilogram of cocaine never occurred was not that defendants were incapable of producing amount but rather because defendants were aware that some government surveillance was going on); *see also United States v. Vopravil,* 891 F.2d 155, 156–58 (7th Cir.1989) (court upheld sentencing based on full kilogram although only two ounces of cocaine were delivered in one-ounce packages during negotiation for one kilogram where transaction involving the kilogram did not occur because defendant wanted to complete transaction in a different location but undercover agent refused).

The piecemeal deal structure arose out of the continued disagreement between the defendants and the undercover agents as to where the deal was to take place and the increasing mistrust as the agents insisted on having the deal go forward in New Jersey. Initially, Caterini and his co-conspirators were willing to provide the full kilogram in large amounts as long as the deal went forward in New York. Specifically, the deal was to go forward on the evening of July 17, 1990 in New York at the home of Dante DeGrandis whereby Caterini, DeMeo and DeGrandis would deliver one-half of the kilogram to the agents and if that went smoothly, the rest would be then be delivered that evening. The transaction did not occur that evening, however, not because the defendants were not capa-

---

**9.** While the court is only sentencing Caterini for his criminal conduct, where the coconspirators work so closely together such that the coconspirators were in constant communication, DeMeo and Caterini arrived together with the heroin for the transfer and Caterini was willing to give up all possible "commission" as he asserted that he was working closely with DeMeo in contemplation of future deals, the statements of Caterini's coconspirators can be used to illustrate that Caterini's statements of capability and intent were not mere "braggadocio." *See United States v. Cardenas,* 917 F.2d 683, 686 (2d Cir. 1990); Guidelines § 6A1.3 (in determining relevant facts in sentencing "[a]ny information may be considered so long as it has 'sufficient reliability to support its probable accuracy.' ").

ble of producing the heroin, but because Sgt. Guslavage refused to go to New York for the deal.

After Sgt. Guslavage refused to go to New York on July 17, 1990, an atmosphere of mistrust pervaded the negotiations and Caterini insisted that the kilogram would be delivered in smaller portions. (Gov't Exh. G 114A at 1–6; G 116A at 1–4; G 117A at 2–4; G 122B at 1–4, 6–7).[10] Caterini's concern is evident from his response to the agents continued insistence on the proposed July 17th transaction going forward at the Marriott:

> What is this? I mean, we gotta be the ones with stuff, don't worry. But the money's fine, but nobody's, we're in a public place. I'm gonna go give me the money. Or you gonna do something, uh, strange. You know, it's not the ah, I'm not pick a; you don't wanna come to the house is fine.... But not even a hotel or night club. Or anything that has got rooms connected and this shit. Cause the stuff is the stuff. With the stuff you do time. Money you can get away with it ... The stuff, I don't give a fuck, is the stuff.

(Gov't Exh. G 110A at 11–12 & 8–15, Tr. of conversation at Marriott on July 17, 1992). Caterini was fully aware of the implications of being caught with a large amount of heroin: "You pick the place, but not here. In this kinda thing; they got the product. They got the one that's going to jail for forty years. Fifty. Or maybe sixty. These days, ..." (Gov't Exh. G 110A at 14 & 8–15, Tr. of conversation at Marriott on July 17, 1992).

Rather than showing incapability to produce the full amount, the piecemeal structure of the deal was established by Caterini in an effort to create trust between the parties and to protect Caterini and his co-conspirators from either the possibility that the alleged buyers were in fact undercover agents or that the defendants would be

apprehended with a large amount of heroin. As Caterini and his coconspirators did not trust the undercover agents, Caterini structured the deals so as to his avoid possible criminal punishment for the full amount.

Not only is Caterini's capability to produce the full amount supported by Caterini's numerous assertions that he was capable of producing the kilogram, but Sgt. Guslavage, an undercover DEA agent involved in the deal and familiar with the defendants involved in the case as well as their sources, testified that he believed that Caterini had the capability to produce the negotiated installments of the· kilogram. Caterini's capability to deliver the heroin is further supported by the actions of one of his sources, Chaudry Mohammed Amin, subsequent to Caterini and DeMeo's arrest. After being arrested DeMeo cooperated and contacted one of Caterini's sources, Chaudry Mohammed Amin, ˋon August 7, 1990 to arrange for the delivery of the next installment of heroin. Amin agreed to provide the next installment of heroin and met with DeMeo on a street corner in Manhattan later that night. (Gov't Exh. G 125A, G 126A & G 127A).

The court finds that the government has met its burden of showing, by a preponderance of the evidence, that Caterini negotiated for a kilogram of heroin and that Caterini had both the intent and capability of producing the kilogram of heroin. The court therefore finds that the amount of heroin involved in the conspiracy for sentencing purposes includes the .29 gram sample delivered on June 8, 1990, the 23.9 gram sample delivered on June 18, 1990 [11] as well as the negotiated kilogram for a total of 1,024.19 grams.

### C. *Escape*

The government has moved for this court to depart upward by two points pursuant to Guidelines § 5K2.0 by analogy to Guide-

---

**10.** Caterini stated that Guslavage would first get 2½ ounces and then, if that went smoothly, he would then get the rest of the kilogram in 2½ ounce portions within a short period of time. (Gov't Exh. G 122B at 1–7 and test. of Sgt. Guslavage of June 8, 9, 10 and July 15, 1992).

**11.** Caterini does not dispute the presentence report's inclusion of the samples delivered on June 8 and June 18, 1990 in the calculation of the amount of heroin to be attributed to Caterini pursuant to Guidelines § 2D1.4.

lines § 3C1.1. The Government asserts that this departure is warranted in that Caterini attempted to escape from Fairton, FCI. The government therefore bears the burden of proving conduct which serves as a basis for upwards departure by a preponderance of the evidence. *United States v. Belletiere,* 971 F.2d at 965 (1992) (citing *United States v. Perdomo,* 927 F.2d 111, 117–18 (2d Cir.1991)). The court finds that the Government has not met its burden of proving that Caterini attempted to escape.

Section 3C1.1 provides for a two point adjustment of the offense level if the defendant willfully obstructed or attempted to obstruct the administration of justice during the investigation, prosecution, or sentencing of the instant offense. Application Note 3 lists various types of conduct to which the enhancement applies; included within that list is "escaping or *attempting to escape* from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." (emphasis added).

■ In determining whether a defendant has attempted to obstruct the administration of justice within the meaning of § 3C1.1, the court is to draw on the general criminal law principles regarding attempts to commit crimes. *See United States v. Shoulberg,* 895 F.2d 882, 885 (2d Cir.1990). Those principles provide that a person is guilty of an attempt to commit a crime if he had the intent to commit the crime and engaged in conduct amounting to a "substantial step towards its commission." *Id.; see also United States v. Ward,* 914 F.2d 1340, 1344–45 (9th Cir.1990) (culpable state of mind otherwise required for the crime defendant is charged with attempting and conduct constituting a substantial step toward the commission of the crime that strongly corroborates that intent required). The requirement of a "substantial step," means that something more than "mere

preparation" is required; it is essential that the defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the "commission of a crime." *Id.; see also United States v. Johnson,* 962 F.2d 1308, 1310–12 (8th Cir.1992) (more than preliminary preparation is required—steps directly aimed at the commission of the crime corroborating the firmness criminal intent required); *Tasty Baking Co. v. Ralston Purina, Inc.,* 653 F.Supp. 1250, 1267 (E.D.Pa.1987) (proof of overt act required to distinguish attempt from mere preparation).

In *Shoulberg,* the court affirmed the district court's holding that defendant's actions constituted an attempt to obstruct justice by attempting to threaten a co-defendant, named Penna thereby mandating an upward adjustment pursuant to § 3C1.1.[12] It was undisputed that the defendant, while in prison awaiting trial, handed a note to a co-defendant, Hamsho. The note combined a request for Penna's address, the indicated intention to use force to prevent Penna from cooperating, and the stated possibility that Shoulberg would soon be released from detention.[13] The district court interpreted the note as a threat against another co-defendant Penna.

In affirming the district court's holding that the defendant's conduct amounted to an attempt to influence or threaten a co-defendant, the court emphasized that mere preparation or mere intent to commit a crime does not amount to attempt, but that some overt act likely to result in the commission of the crime must have occurred. *Id.* at 885. The court found that Shoulberg's handing the note to Hamsho constituted a sufficient overt act likely to result in the commission of the offense because the note constituted a threat communicated to the intermediary, Hamsho, and that had

---

**12.** The commentary to § 3C1.1 provides that the section is directed at willful interference with the disposition of criminal charges by threatening or unlawfully attempting to influence a co-defendant. *Shoulberg,* 895 F.2d at 884.

**13.** The note stated:

Sony, listen, I might be getting out on bail. I didn't even know you on the street so I can't hurt you. The other guys I don't trust at all. Billy's nothing. They'll work on Penna—tell me where does he live. If he is fucking I got a trick for his ass. Write me back today.

the government not intervened, Hamsho would likely have relayed the threat to Penna. *Id.* at 885–86.

The court finds that Caterini's actions did not rise to the level of an attempt. Not only is there a lack of a sufficient overt act likely to result in the commission of the escape, but that Caterini's involvement in any preparations was minimal and the firmness of any intent to escape on the part of Caterini is far from clear. At most, Caterini has engaged in mere preparation; there has been no overt act by Caterini likely to result in the commission of an escape from Fairton. Caterini discussed the possibility of an Ultralight landing and taking off from the prison recreation yard with Barrett and, after Barrett informed Caterini that an Ultralight was not feasible, Barrett, not Caterini, suggested the use of a helicopter. Thereafter, Caterini's sole involvement was talking to various inmates and asking them whether they could come up with the amount of money requested by Barrett. No money was ever produced and no finalized plan was ever established.

The lack of any substantial step by Caterini towards the commission of the offense is highlighted by a comparison to other cases where the courts have found sufficient steps of the defendants leading towards the commission of an escape to hold that there was an attempted escape. In *United States v. Trapnell*, 638 F.2d 1016, 1023–24 (7th Cir.1980), for example, the appellate court affirmed convictions for an attempted escape from prison by helicopter where the defendant-prisoners went to an unauthorized point in the prison to which one of the co-defendants in the helicopter tried to force the pilot to land, the prisoners arranged for outside help and supplies, put a yellow jacket on the ground as previously agreed, waived the helicopter in, and carried the supplies with them to be used in the escape. Similarly in *United States v. Kramer*, 943 F.2d 1543, 1546 (11th Cir.1991), *petit. for cert. filed* April 30, 1992, the defendant was convicted of attempted escape where the prisoner met the helicopter as it landed in the recreation yard only to be stopped from escape as the tail of the helicopter hit a wire in the yard and causing the helicopter to crash within prison grounds.[14] *Id.; see also United States v. Clark*, 792 F.Supp. 637 (W.D.Ark. 1992).[15]

The government has cited the recent case of *United States v. Melton*, 970 F.2d 1328, 1332–33 (4th Cir.1992), in support of the argument that although Caterini was unsuccessful, that his sentence should be adjusted because of the attempted escape. In *Melton*, however, unlike the instant case, the defendant had performed an overt act likely to result in the commission of the crime. Specifically, the defendant, in addition to admitting that he attempted to escape, kicked a deputy and ran approximately twenty yards down the hall before being apprehended. *Id.* 970 F.2d at 1332–33 & n. 11. As the court finds that Caterini has not engaged in conduct amounting to a "substantial step towards its commission" of an escape and that such mere preparation is not sufficient to constitute an attempted escape, the Government's motion for an adjustment or departure by analogy to § 3C1.1 is denied.

### D. *Acceptance of Responsibility*

The government has requested, in light of Caterini's alleged escape attempt, that Caterini be denied the two point downward adjustment for acceptance of responsibility originally stipulated to in the plea agreement. The court's finding that Caterini's actions did not rise to a level of attempted escape does not require the court

---

**14.** The court further notes that there was extensive planning of the escape in *Kramer* including arrangements for a helicopter to land in the recreation yard, a car with a secret compartment for hiding, and airplane fitted with extra fuel tanks and a safe house. *Id.* at 1549.

**15.** In *Clark*, the court recognized that an adjustment pursuant to § 3C1.1 would be proper under the guidelines where defendant had files and hacksaw blades smuggled into the prison, a file was found in the prison, defendant had removed plexiglass from a prison window, two bars behind the plexiglass window had been removed, metal screen behind the bars cut in several places, and the prisoner had otherwise tampered with the window.

to reject the request. The court finds that the denial of the two level adjustment is appropriate in light of Caterini's flight to Canada and will deny Caterini the two point downward adjustment for acceptance of responsibility.

The court is not bound by the Government's stipulation to a two point reduction for acceptance of responsibility in the plea agreement. *See United States v. Singh,* 923 F.2d 1039, 1043–44 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2065, 114 L.Ed.2d 469 (1991); *United States v. Moya,* 730 F.Supp. 35, 39–40 (N.D.Tex.1990); *see also* U.S.S.G. § 3E1.1(c) ("A defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a matter of right."); Policy Statement 6B1.4(d) ("The court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing.") Moreover, the plea agreement provides: "This agreement to stipulate, however, cannot and does not bind the sentencing court, which may make independent factual findings and may reject any or all of the stipulations entered into by the parties." (Plea Agreement of Caterini dated November 4, 1991.)

Although the defendant in the instant case has admitted his involvement in the offense and related conduct, a plea of guilty is not dispositive as to the defendant's acceptance of responsibility. *See Singh,* 923 F.2d at 1043. The Guidelines call for a two-level reduction in the defendant's base offense level "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." Guidelines § 3E1.1(a); *see also Singh,* 923 F.2d at 1042; *United States v. Ofchinick,* 877 F.2d 251, 255 (3d Cir.1989). In deter-mining whether a defendant has accepted responsibility, the Application Notes to Guideline § 3E1.1 provide a non-inclusive list of appropriate considerations to apply in determining whether a defendant qualifies for a reduction. *Ofchinick,* 877 F.2d at 255.

In holding that the downward adjustment is inappropriate, the court is guided by Application Note 4 to Guidelines § 3E1.1. Application Note 4 provides: "Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the Defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." [16]

Caterini fled to Canada and failed to appear at a scheduled hearing before this court in violation of the terms of his supervised release. Caterini was eventually arrested on May 17, 1991 by the Royal Canadian Mounted Police in Montreal, Canada. Caterini was indicted for bail jumping in violation of 18 U.S.C. § 3146 on June 6, 1991 (Crim. No. 91–246 (JFG)). Caterini waived extradition and was returned to the United States where he has remained in custody without bail. Caterini's flight to Canada constituted an obstruction of justice pursuant to § 3C1.1.[17]

The court finds that Caterini's conduct of fleeing to Canada after his arrest for the drug offense that resulted in an enhancement under § 3C1.1 for obstructing justice indicates that Caterini has not clearly demonstrated a recognition and affirmative acceptance of responsibility for his criminal

---

16. Application Note 4 was amended effective Nov. 1, 1989 to provide for extraordinary cases in which adjustments under both sections are appropriate and to clarify the previous reference to obstructive conduct. The Application Note previously provided that "an adjustment under this section is not warranted where a defendant perjures himself, suborns perjury, or otherwise obstructs the trial or administration of justice, regardless of other factors."

17. The plea agreement contains a stipulation that Caterini's flight to Canada constituted an obstruction of justice pursuant to Guidelines § 3C1.1. The Application Note to § 3C1.1 provides that such conduct amounts to an obstruction: "The following is a non-exhaustive list of ... the types of conduct to which this enhancement applies: ... (e) escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding."

conduct.[18] This is not an "extraordinary case" in which a downward adjustment may be proper notwithstanding the previously imposed upward adjustment under § 3C1.1. *See United States v. Paige,* 923 F.2d 112, 114 (8th Cir.1991) (in applying Application Note 4 to § 3E1.1 court refused to award defendant who pled guilty to interstate transportation of stolen vehicle and whose attempts to evade arrest engaging in high speed chase mandated adjustment pursuant to § 3C1.1 downward adjustment for acceptance of responsibility); *United States v. Scott,* 915 F.2d 774, 776 (1st Cir.1990) (defendant who pled guilty to charge of willfully making false material statements impeding an on-going investigation was not entitled to two point reduction as false statements amounted to obstruction of justice).

## IV. CONCLUSION

For the reasons set forth above, the court finds that the amount of heroin to be attributed to defendant Caterini for guidelines purposes is 1,024.19 grams; Caterini did not engage in conduct amounting to an attempt to escape from Fairton thereby mandating an upward departure for obstruction of justice; and that Caterini does not qualify for a two point downward adjustment for acceptance of responsibility.

---

**18.** The court further notes that Caterini's lack of affirmative acceptance of responsibility is further supported by the threats Caterini made against Government agents prior to the trial of this matter in an effort to keep the agents from testifying and Caterini's failure to plead guilty until after an unsuccessful suppression hearing on the day of trial. *See Application Note 4 to* § 3E1.1 & Application Note 3 to § 3C1.1 (threatening, intimidating or otherwise unlawfully influencing a witness indicates that the defendant has not accepted responsibility); Application Note 1 to § 3E1.1 (timeliness of defendant's conduct in manifesting the acceptance of responsibility is an appropriate consideration).